Filed 10/6/16 Unmodified opinion attached

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| LSREF2 CLOVER PROPERTY 4, LLC,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>FESTIVAL RETAIL FUND 1, LP,<br><br>    Defendant and Respondent. | B259937<br><br>(Los Angeles County<br>Super. Ct. No. SC117145)<br><br>**ORDER MODIFYING OPINION**<br>**[No Change in Judgment]** |

THE COURT:

The opinion filed herein on October 4, 2016, is ordered modified as follows:

Page 1: Following counsel listing for Plaintiff and Appellant, insert before counsel listing for Defendant and Respondent a new paragraph listing counsel for Amicus Curiae.

Bryan Cave and Joseph J. Poppen for California Bankers as Amicus Curiae on behalf of Plaintiff and Appellant.

This modification does not effect a change in judgment.

Filed 10/4/16 Unmodified opinion

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| LSREF2 CLOVER PROPERTY 4, LLC, | B259937 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. SC117145) |
| v. | |
| FESTIVAL RETAIL FUND 1, LP, | |
| Defendant and Respondent. | |

　　　　APPEAL from a judgment of the Superior Court of Los Angeles County. Gerald Rosenberg, Judge.  Reversed and remanded with directions.

　　　　Ronald W. Stevens; K&L Gates, Kevin S. Asfour, Christina N. Goodrich and Rebecca Liu for Plaintiff and Appellant.

　　　　Lurie, Zepeda, Schmalz, Hogan & Martin, Bruce J. Lurie, Troy L. Martin and James J. Finsten for Defendant and Respondent.

_____

Defendant and respondent Festival Retail Fund 1, LP (Festival Fund), guaranteed a loan made to an affiliate in connection with the purchase of a retail property. Following default on the loan and a nonjudicial foreclosure, plaintiff and appellant LSREF2 Clover Property 4, LLC (Clover), sought to enforce the guaranty. At a bench trial, the trial court determined the guaranty was unenforceable. The court found that Festival Fund was protected by antideficiency laws because it was, in reality, the primary obligor on the loan and the loan guaranty was effectively a sham.

We reverse. Substantial evidence does not support a conclusion that Festival Fund was a principal obligor on the loan. Rather, Festival Fund itself structured the transaction and determined that its affiliate—a separate legal entity—would take out the loan and take title to the property. The trial court therefore erred in applying a sham guaranty defense and entering judgment in favor of Festival Fund.

## BACKGROUND

### Facts

Festival Fund is a limited partnership formed in September 2006 for the purpose of investing in retail properties. Goldman Sachs Investments Ltd. (Goldman Sachs) was the lead investor, a limited partner, and the primary funder of Festival Fund. Mark Schurgin, the president of the general partner of Festival Fund, indirectly held an ownership interest in Festival Fund, and negotiated loans on behalf of Festival Fund and its affiliates. Festival Fund's limited partnership agreement provided that, absent approval from the lead investor and the general partner, Festival Fund would not purchase property except through a "single-purpose" company.

In April 2007, Festival Fund entered into an agreement to purchase property at 357 North Beverly Drive in Beverly Hills (the property). In the purchase agreement, Festival Fund reserved the option to assign its rights and take title to the property under "a limited liability company or other single purpose entity (SPE)," if the SPE was owned and controlled by Festival Fund or an affiliate.

In May 2007, Schurgin caused the SPE that would take title to the property— Festival Retail Fund 1 357 N. Beverly Drive, LP (Festival 357)—to be formed by the

2

filing of a certificate of limited partnership. The same day, he also filed a certificate of formation for a limited liability company named FRF1 357 N. Beverly Drive, LLC (FRF1). FRF1, which was owned entirely by Festival Fund, was made the general partner of and owned .01 percent of Festival 357, while Festival Fund was a limited partner in Festival 357 and owned the remaining 99.99 percent of it.

Festival Fund had structured other real estate transactions in a similar manner, using SPE's to take title. Schurgin testified that one of his objectives in setting up such a real estate transaction was to limit Festival Fund's liability. Edmund Byrne, the former head of lending at Anglo Irish Bank (the eventual lender here; the Bank), testified that both lenders and borrowers saw advantages from the use of SPE's. The borrowing side potentially could keep equity in the project separate from claims against the parent developer's other projects, while the bank's security in the project likewise was potentially insulated from claims asserted against the developer.

In the summer of 2007, after execution of the purchase agreement for the property, and after formation of Festival 357 and its general partner FRF1, Schurgin approached the Bank for the purpose of obtaining a loan on behalf of Festival 357 to finance the purchase of the property. The Bank provided "term sheets" of a proposed loan, first with a "TBD entity" as the proposed borrower, and then with Festival 357 as the proposed borrower. In both sets of terms sheets, Festival Fund was listed as the proposed guarantor.

On October 1, 2007, Festival Fund assigned its rights to purchase the property to Festival 357.

On October 2, 2007, the Bank requested the organizational documents of Festival 357, FRF1, and Festival Fund. The same day, Schurgin executed Festival 357's limited partnership agreement and FRF1's limited liability company agreement, and forwarded these and other organizational documents to the Bank. Festival 357's limited partnership agreement stated, in part, that its purposes were to obtain a loan from the Bank and acquire, operate, and manage the property.

3

On October 23, 2007, Festival 357, as sole borrower, entered into a loan agreement, promissory note, and deed of trust with lender Bank, and took title to the property. The loan totaled $25,025,000. It was secured by the property and contained an assignment of leases and rents from the property (which was an income-producing, retail property) to the Bank. In connection with the closing, Festival Fund made a $9 million equity contribution to Festival 357.

Further, as a condition of the loan, "to induce [the Bank] to extend credit to [Festival 357]," Festival Fund entered into a guaranty with the Bank, whereby Festival Fund guaranteed $1.5 million of the $25,025,000 loan. Pursuant to Civil Code section 2856, the guaranty contained an express waiver of any antideficiency protections Festival Fund might have otherwise had under California law.

Prior to making the loan, the Bank required that it receive and approve the limited partnership agreements of Festival Fund and Festival 357, as well as the limited liability company agreement of FRF1. In addition, the Bank obtained financial information of Festival Fund to ensure that it could pay the guaranty, if necessary. Other than requiring that Festival 357 had received equity, the Bank was not concerned with its financial condition, or with the financial condition of FRF1. The Bank did appraise the property, however, because, according to Byrne, the value of the property, and its cash flow from rent, was the most important factor in determining whether the loan could be satisfied.

In July 2011, Festival 357 defaulted on the loan. In October 2011, the Bank assigned all of its rights in the loan to LSREF2 Clover, LLC, which then assigned its rights to Wells Fargo Bank, N.A. (Wells Fargo). Wells Fargo issued a default notice to Festival 357 and Festival Fund in November 2011, reflecting a principal balance of nearly $23 million and interest and other charges of approximately $600,000. Wells Fargo demanded that these amounts be paid immediately by Festival 357. It also demanded that Festival Fund pay the guaranty. Festival 357 did not make any of the demanded payments on the loan, and Festival Fund did not pay the guaranty.

4

**Procedural history**

In May 2012, Wells Fargo filed an action for judicial foreclosure and breach of guaranty against Festival 357 and Festival Fund. In July 2012, Wells Fargo assigned the loan and guaranty to Clover, and the property was subsequently purchased by Clover at a nonjudicial foreclosure sale for approximately $17.5 million. Clover thereafter substituted in as plaintiff for Wells Fargo, dismissed the causes of action against Festival 357, and pursued the claim against Festival Fund for breach of guaranty.

Clover filed a motion for summary judgment on the guaranty claim, which the trial court denied, finding that there were triable issues of fact whether the guaranty was a sham. Subsequently, the parties agreed to a bifurcated trial so that the court first could determine whether Festival Fund had a valid defense based on a purported single business enterprise defense. In briefing the issue, Festival Fund argued it was an alter ego of FRF1, which was liable for the debts on the loan as a general partner of Festival 357. Festival Fund itself was therefore a principal obligor on the loan, Festival Fund contended, and was protected by unwaivable antideficiency protections. At the bifurcated trial, in addition to addressing the "single business enterprise" defense, the parties also presented testimony, evidence, and argument relevant to whether Festival Fund had a valid sham guaranty defense.

Following the trial on Festival Fund's claimed defenses, the trial court found that Festival Fund was entitled to judgment in its favor on Clover's sole remaining claim for breach of guaranty. In orally making its ruling, the court noted that the Bank required that Festival Fund enter into the guaranty. The court also emphasized that the Bank drafted the loan documents, and found that several provisions in the documents demonstrated that Festival Fund was an obligor on the loan, and not just a guarantor. In addition, the court found there was a "unity of interest" between FRF1 and Festival Fund based on: FRF1's lack of assets, its absence of day-to-day business dealings, its identical directors and mailing address as Festival Fund, and its lack of employees. In an ensuing written order, the court concluded that Festival Fund and FRF1 "formed a single business

5

enterprise, making [Festival Fund] a primary obligor and entitled to the unwaivable protections of California's anti-deficiency laws."[1]

Clover appealed from the judgment in Festival Fund's favor on the breach of guaranty action.

## DISCUSSION

### I. Antideficiency statutes and the sham guaranty defense

California's antideficiency laws are codified in Code of Civil Procedure sections 580a through 580e and 726.[2]  As relevant here, these statutes prohibit a lender from obtaining a deficiency judgment from a borrower following a nonjudicial foreclosure of real property.  (§ 580d, subd. (a); *California Bank & Trust v. Lawlor* (2013) 222 Cal.App.4th 625, 631 (*Lawlor*).)

The antideficiency statutes' protections generally do not extend to guarantors. (§ 580d, subd. (b); *CADC/RADC Venture 2011-1 LLC v. Bradley* (2015) 235 Cal.App.4th 775, 784 (*Bradley*).)  "[A] lender may recover a deficiency judgment from a guarantor who waives his or her antideficiency protections, even though the antideficiency statutes would bar the lender from recovering that same deficiency from the primary borrower." (*Bradley*, at p. 784.)  Civil Code section 2856, subdivisions (a)(3) and (c) expressly allow a guarantor to waive antideficiency defenses.  Such a waiver was expressly incorporated into the guaranty at issue here.

Even when a guarantor waives antideficiency protections, however, the protections may still apply if the named guarantor is in actuality a principal borrower. (*Cadle Co. II v. Harvey* (2000) 83 Cal.App.4th 927, 932.)  "To be subject to a deficiency judgment, . . . a guarantor must be a true guarantor, not merely the principal obligor

---

[1]     A jury trial was subsequently held on cross-claims brought by Festival Fund and Festival 357 against Wells Fargo and Clover.  The jury found in favor of the cross-defendants.

[2]     Unless otherwise stated, further statutory references are to the Code of Civil Procedure.

6

under a different name. [Citations.] Indeed, Civil Code section 2787 defines a guarantor as 'one who promises to answer for the debt, default, or miscarriage of another . . . .'" (*Lawlor*, *supra*, 222 Cal.App.4th 625, 632 [italics omitted].) When a principal borrower provides a guaranty on a debt, the guaranty—which effectively adds nothing to the primary obligation—is a sham, and therefore antideficiency defenses apply. (*Ibid.*)

A lender may not obtain a deficiency judgment on a guaranty that is shown to be a sham. In determining whether a guaranty is a sham, the court examines whether the guarantor is actually the principal obligor, which occurs when "(1) the guarantor personally executes underlying loan agreements or a deed of trust or (2) the guarantor is, in reality, the principal obligor under a different name by operation of trust or corporate law or some other applicable legal principle." (*Bradley*, *supra*, 235 Cal.App.4th 775, 786-787.) When there is "adequate legal separation between the borrower and the guarantor, e.g., through the appropriate use of the corporate form," the sham guaranty defense generally will not apply. (*Id.* at p. 787.) The court also determines whether the lender itself structured the loan transaction to avoid the antideficiency laws. (*Ibid.*) The object of this analysis is to determine whether the lender designed the transaction so that the primary source for repayment of the loan was placed in the role of guarantor rather than named borrower. (*Lawlor*, *supra*, 222 Cal.App.4th 625, 638.) The court's overall focus when examining whether guaranties are shams is to "look to the purpose and effect of the parties' agreement to determine whether the guaranties constitute an attempt to circumvent the antideficiency law and recover deficiency judgments when those judgments otherwise would be prohibited." (*Id.* at p. 638.)

## II. **Substantial evidence does not support the trial court's ruling**

### A. **Standard of review**

In discussing the standard of review on appeal, both parties fail to focus on the absence of a statement of decision. Although the bench trial on Festival Fund's defenses was bifurcated, a statement of decision could have been requested and rendered. (Cal. Rules of Court, rule 3.1591(a).) The record reveals no request for a statement of decision, and, although the court ruled orally and issued a subsequent written order in

7

Festival Fund's favor, it did not issue a statement of decision. (See § 632 [trial court shall issue statement of decision upon request]; Cal. Rules of Court, rule 3.1590 [discussing steps for announcement of tentative decision, request for statement of decision, proposed statement of decision, and statement of decision]; see also *Tyler v. Children's Home Society* (1994) 29 Cal.App.4th 511, 526, fn. 7 [trial court's "Opinion and Ruling" did not constitute a statement of decision, but could be used on appeal to discover grounds for judgment and show absence of prejudice in any error].)

The lack of a statement of decision affects the tenor of appellate review. When a statement of decision is not issued, the appellate court applies the doctrine of implied findings, meaning that we presume the trial court "made all factual findings necessary to support the judgment for which substantial evidence exists in the record. In other words, the necessary findings of ultimate facts will be implied and the only issue on appeal is whether the implied findings are supported by substantial evidence." (*Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 267.)

The impact of the doctrine of implied findings in this matter, however, is somewhat mitigated by the relative absence at trial of disputed issues of fact. The relevant evidence consisted primarily of documents pertaining to the Festival companies' formation and the loan agreements. We review legal conclusions arising from an established set of facts independently. (*Haworth v. Superior Court* (2010) 50 Cal.4th 372, 385; *F. Hoffman-La Roche, Ltd. v. Superior Court* (2005) 130 Cal.App.4th 782, 794). Likewise, unless interpretation of a written document "depends on the credibility of conflicting extrinsic evidence, the interpretation of a writing involves a question of law for de novo review by the appellate court." (*Mayer v. C.W. Driver* (2002) 98 Cal.App.4th 48, 57.)

**B. The evidence demonstrated the guaranty was not a sham**

Festival Fund only executed the guaranty, not the underlying loan agreements. Therefore, in order for the sham guaranty defense to apply, substantial evidence must

8

support a finding that Festival Fund was the true principal obligor,[3] and that the Bank structured the loan transaction to circumvent the antideficiency law by casting Festival Fund as the guarantor instead of the borrower. (*Bradley*, *supra*, 235 Cal.App.4th 775, 786-787; *Lawlor*, *supra*, 222 Cal.App.4th 625, 638.)

We find that the evidence allows for no such conclusion. Instead, the evidence shows that Festival Fund itself structured the transaction, including the ownership structure under which it obtained the loan. Festival Fund's limited partnership agreement—which was executed well before Festival Fund approached the Bank—stipulated that it would purchase property through SPE's. Consistent with this provision, Festival Fund employed SPE's to take title in numerous real estate transactions, and Schurgin testified that one of his objectives in doing so was to limit Festival Fund's liability. When purchasing the property at issue here, Festival Fund expressly reserved the option to take title under an SPE. Festival 357, the SPE that would take title (and which included the address of the property in its name), was formed in May 2007, well prior to the time a loan was sought from the Bank. Festival 357's general partner, FRF1, was also formed in May 2007, and also without involvement by the Bank. Thus, by the time Festival Fund approached the Bank, it had already created the structure under which Festival 357 would hold title and would be owned by FRF1 and Festival Fund, where FRF1 would be the general partner of Festival 357, and where Festival Fund would be a limited partner of Festival 357 and would own FRF1. The loan transaction simply corresponded with this already-determined structure.

---

[3]     As noted in *Bradley*, a guarantor may be treated as a primary obligor by operation of trust or company law. (*Bradley*, *supra*, 235 Cal.App.4th 775, 786-787.) This could occur, for example, in the case of a general partner guaranteeing a loan taken by its limited partnership, where the general partner does not otherwise limit its liability by agreement. (See Corp. Code, § 15904.04, subd. (a) ["all general partners are liable jointly and severally for all obligations of the limited partnership unless otherwise agreed by the claimant or provided by law"].) Here, Festival Fund was not the general partner of Festival 357, so further evidence supporting a conclusion that it was the true principal obligor was required to apply the antideficiency statutes.

*Bradley*, where the appellate court reversed a jury verdict applying a sham guaranty defense, involved a similar factual scenario. The defendants in *Bradley* were two individuals who each owned 50 percent of a corporation, which in turn owned a limited liability company that held title to a parcel of real property. (235 Cal.App.4th 775, 780-782.) In connection with the purchase of property, a bank provided a loan to the limited liability company. The loan was secured by a deed of trust, and both defendants executed guaranties for the entirety of the loan. (*Ibid.*) The loan went into default, and, after the bank's successor foreclosed on the property, it sought to obtain the deficiency from the defendant guarantors, eventually filing an action for breach of guaranties. (*Id.* at pp. 782-783.) In finding that the bank did not structure the loan transaction to subvert the antideficiency laws, the appellate court emphasized how defendants, not the bank, created the ownership structure, including the entity that took title to the property. (*Id.* at pp. 790-791.) There was no indication the lender "forced defendants to borrow through a shell entity or that it dictated the form that shell entity should take." (*Id.* at p. 790.) The court also noted that the defendants themselves chose to use a corporate borrower, in their case so they could take advantage of tax breaks. (*Id.* at pp. 790-791.) Although the bank requested corporate records and financial information and required that guaranties be given, defendants were primarily responsible for designing the ownership and borrowing structure, so imposition of the sham guaranty defense was not warranted. (*Id.* at pp. 790-792.)

*Lawlor*, *supra*, 222 Cal.App.4th 625, like *Bradley*, examined the effectiveness of guaranties given by individual defendants on a loan taken by an affiliated company. In finding that the sham guaranty defense did not apply, the appellate court noted that the defendants, not the lender, selected the entities and the forms of the entities that were the borrowers. (*Lawlor*, at p. 639.) The defendants themselves formed separate entities to "protect themselves from those entities' liabilities." (*Id.* at p. 640.) The court found that without evidence the lender had a role in the formation of the borrowers, there was "no basis for the conclusion those entities were designed to conceal Defendants' status as the primary obligors." (*Ibid.*)

10

Likewise, in this action, there was no basis to find that the Bank had a role in the formation of Festival Fund or its affiliated entities, and no evidence to support a conclusion that the entities were designed by the lender to conceal the identity of the primary obligor. In this fundamental respect, the instant matter differs from *River Bank America v. Diller* (1995) 38 Cal.App.4th 1400 (*River Bank*), a case relied on by Festival Fund. In *River Bank*, the lender (River Bank) initially contemplated entering into a joint venture with the developer of a project. (*Id.* at p. 1407.) However, after engaging in negotiations, River Bank informed the developer "it had decided unilaterally to change the entire structure of the proposed agreement." (*Id.* at p. 1421.) Further, during the course of drafting the final documentation, "'counsel for River Bank insisted that in order to render "enforceable" the "guaranty" being given by [the developer], a new "borrower" should be brought into existence.'" (*Ibid.*) River Bank required that this new borrower be a limited partnership, and prohibited the developer from acting as its general partner. (*Id.* at pp. 1421-1422.) In affirming an order denying a motion for summary adjudication to enforce guaranties, the appellate court found the guarantors "raised a triable issue of fact whether, by structuring the loan transaction as it did, River Bank subverted the purpose of the antideficiency laws 'by making a related entity the debtor while relegating the principal obligors to the position of guarantors.'" (*Id.* at p. 1423.) In contrast, the evidence here shows that the overall makeup of the transaction was determined prior to the time that Festival Fund approached the Bank, which had no role in determining the Festival companies' structure.

Festival Fund argues that, by requiring a guaranty from Festival Fund, the Bank demonstrated that it primarily looked to Festival Fund to fulfill the debt obligations. Requiring a guaranty from a person or entity affiliated with the borrower, however, does not, in itself, indicate a likelihood that the guaranty is a sham. (See *Bradley*, *supra*, 235 Cal.App.4th 775, 781 [lender required guaranties from individuals owning more than 20 percent of borrowing entity]; *Lawlor*, *supra*, 222 Cal.App.4th 625, 629 [requiring guaranties from individuals and entity affiliated with borrower].) If it did, any guaranty given by an affiliate of a borrower would be considered suspicious, defeating the

11

purposes of Civil Code sections 2787 (which allows a guarantor to "answer for the debt, default, or miscarriage of another") and 2856 (allowing a guarantor to waive antideficiency defenses). In basically all instances, a guarantor will have some relationship to the borrower; people do not often agree to answer for the debts of total strangers.

The amount of the guaranty here also supports the conclusion that the Bank did not view Festival Fund as the primary obligor. The guaranty was for $1.5 million of a $25,025,000 loan. If the Bank *had* considered Festival Fund the primary obligor, its agreement to cap the guaranty at approximately 6 percent of the total amount loaned would be stunningly irrational, since the Bank would expose itself to the vast bulk of any likely deficiency.

Festival Fund further contends that the guaranty was a sham because the Bank required the Festival companies to submit their organizational documents for its approval. An identical argument was rejected in *Bradley*. As the court noted, "there is a significant difference between requesting information about a borrowing entity and insisting upon the use of one and the form it should take." (*Bradley*, *supra*, 235 Cal.App.4th 775, 790.)

Festival Fund's related assertion that the Bank required financial information of Festival Fund and not the borrower, Festival 357, also does not compel a conclusion that the guaranty was a sham. As stated in *Lawlor*, "There is nothing unusual about a bank asking for financial information from a person or entity that is guaranteeing a loan." (222 Cal.App.4th 625, 640.) The court in *Bradley* noted that a lender's consideration of only the financial strength of the guarantor could be indicative in certain circumstances of an attempt to skirt the antideficiency laws. (235 Cal.App.4th 775, 791, citing *River Bank*, *supra*, 38 Cal.App.4th 1400, 1423.) The *Bradley* court found no basis to accord such evidence any weight in that matter, however, since the defendant itself chose to borrow through a corporation for tax purposes. (235 Cal.App.4th at p. 791.) Similarly, in this case, Festival Fund sought to limit its own liability by having Festival 357 enter into the loan agreement and take title to the property. Moreover, the evidence here shows that the Bank did examine the ability of Festival 357 to repay the loan. The Bank appraised the

12

property—an income-producing, retail property—and the loan agreement contained an assignment of lease and rents. According to Byrne, the most important factor to the Bank in determining whether the loan could be satisfied was the value of the property and its cash flow from rent. Thus, the evidence demonstrates the Bank understood the borrower would be responsible for satisfying the loan, based on the property's value and income potential.

Festival Fund next argues that contractual provisions demonstrate it was a primary obligor. Festival Fund points to language in the guaranty referring to the guarantor as "a primary party and not merely as a surety." Festival Fund contends that this provision shows it was a "primary party" to the loan. The phrase at issue, however, has no object—it does not state what the guarantor was a "primary party" to. The most obvious and correct conclusion is that Festival Fund was a "primary party" to the guaranty. Such a conclusion is consistent with the terms of the guaranty, which define Festival as the guarantor, and the loan agreement, which expressly states the agreement is between Festival 357 (not Festival Fund) and the Bank. (See Civ. Code, §§ 1641 [giving effect to entire contract], 1642 [several instruments covering one transaction are taken together].)

Festival Fund also argues the loan agreement's statement "the Obligations of Borrower and the obligations of Guarantor under the Loan Documents shall be joint and several . . ." demonstrates Festival Fund was the principal obligor. Festival Fund was not a party to the loan agreement, however, so it is unclear how this statement could obligate it to fulfill the terms of the agreement. Furthermore, such an interpretation would be inconsistent with the loan agreement's "Limitation on Liability" provision, stating: "Anything herein . . . to the contrary notwithstanding, Lender agrees that, for repayment of the Loan and the payment and performance of any and all of Borrower's obligations . . . [Lender] will look solely to the Borrower, the Property and the other assets of Borrower . . . and no other property or assets of Borrower's direct or indirect constituent partners . . . shall be subject to levy, execution or other enforcement procedure for the satisfaction of remedies of Lender . . . ." The clear effect of this provision is that, irrespective of any other language in the loan agreement, in the event of default, the Bank

would seek recompense from only Festival 357 and the property itself to fulfill the obligations of the loan agreement. There is no basis to conclude Festival Fund was contractually obligated to satisfy the loan agreement.

In sum, substantial evidence does not support a finding that Festival Fund was the true principal obligor and that the Bank structured the transaction to circumvent antideficiency laws.

### C. The claimed "single business enterprise" defense did not apply

Festival Fund argues that judgment in its favor on the breach of guaranty claim was also proper because there was a "unity of interest" between Festival Fund and FRF1, making Festival Fund the de facto general partner of Festival 357 and responsible for its debts. (See Corp. Code, § 15904.04 [ordinarily, general partners are liable for obligations of limited partnership].)

The "single business enterprise" theory asserted by Festival Fund is a variant of the alter ego doctrine. "Generally, alter ego liability is reserved for the parent-subsidiary relationship. However, under the single-enterprise rule, liability can be found between sister companies. The theory has been described as follows: '"In effect what happens is that the court, for sufficient reason, has determined that though there are two or more personalities, there is but one enterprise; and that this enterprise has been so handled that it should respond, as a whole, for the debts of certain component elements of it."'" (*Las Palmas Associates v. Las Palmas Center Associates* (1991) 235 Cal.App.3d 1220, 1249-1250.)

There are two standard requirements for finding alter ego (and single business enterprise) liability: "'"(1) that there be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist and (2) that, if the acts are treated as those of the corporation alone, an inequitable result will follow.'" (*Mesler v. Bragg Management* Co.(1985) 39 Cal.3d 290, 300 (*Mesler*).) The doctrine generally applies when upholding the defendant's corporate form will work an injustice to an innocent plaintiff. (*Ibid.*; *Webber v. Inland Empire Investments, Inc.* (1999) 74 Cal.App.4th 884, 900-901.) "[A]lter ego is used to prevent a corporation from using its

14

statutory separate corporate form as a shield from liability only where to recognize its corporate status would defeat the rights and equities of third parties; it is not a doctrine that allows the persons who actually control the corporation to disregard the corporate form." (*Communist Party v. 522 Valencia, Inc.* (1995) 35 Cal.App.4th 980, 994.)

Alter ego is normally a basis for liability, not a defense. However, alter ego principles have been considered in sham guaranty cases examining whether a guarantor is actually the principal obligor. (See *Bradley*, *supra*, 235 Cal.App.4th 775, 789 [declining to pierce veil of corporate owner of borrower, finding that it observed corporate formalities]; *Valinda Builders, Inc. v. Bissner* (1964) 230 Cal.App.2d 106, 110 [in applying sham defense guaranty, finding that undercapitalized purported borrower was a "mere shell of a corporation"].) Nevertheless, the overriding concern when deciding whether the sham guaranty defense applies is whether the guaranty is an attempt to circumvent the antideficiency laws. (See *Lawlor*, *supra*, 222 Cal.App.4th 625, 638.) Thus, the presence of a potential alter ego relationship is just one factor to consider when analyzing a sham guaranty defense. In a situation like the one here, where the lender neither structures the transaction nor knows, at the time of making the loan, of a borrower's (or an affiliate's) failure to follow corporate formalities, there generally will be no basis to apply the sham guaranty defense.

Festival Fund, in arguing that it is properly considered a single enterprise with its affiliate FRF1, states that FRF1 never had a bank account, never owned assets or made investments other than a .01 percent interest in Festival 357, never had income, never had employees or paid for services, held no regular meetings, did not conduct day-to-day business, and was undercapitalized. The evidence, though, does not show that the Bank was aware of most if any of these failures to follow corporate formalities. To allow a guarantor to avoid its obligations simply because the debtor's general partner—which is owned entirely by the guarantor—avoided complying with corporate necessities would work an absurdity. Guarantors could choose to avoid liability by instructing their affiliated companies to disregard corporate formalities. If an alter ego (or single business

15

enterprise) defense applied in these situations, it would promote an inequitable result, exactly what the doctrine is designed to avoid. (See *Mesler*, *supra*, 39 Cal.3d 290, 300.)

*Lawlor* reasoned: "Individuals may structure their own business dealings to limit their personal liability, but they must accept the risks that accompany the benefits of incorporation." (222 Cal.App.4th 625, 639.) Schurgin testified that the structure used here was chosen by Festival Fund to limit its liability. Festival Fund may have insulated itself from potential claims on the property by legally separating itself from Festival 357, the borrower and the owner of the property, but by doing so, Festival Fund could not also claim the benefit of antideficiency protections.

In conclusion, viewing the trial evidence in the light most favorable to the judgment, the sham guaranty defense, and the asserted, related single business enterprise defense, did not apply.

## DISPOSITION

The judgment in favor of Festival Fund on Clover's action for breach of guaranty is reversed. On remand, the trial court shall determine to what extent, if any, aspects of Clover's claim, including any defenses thereto, remain to be tried.

Clover shall recover costs on appeal.

CERTIFIED FOR PUBLICATION.


BOREN, P.J.

We concur:


ASHMANN-GERST, J.


HOFFSTADT, J.

16