Filed 6/13/24  Townsend v. Cordova CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| SHAMIKA TOWNSEND,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>ANGEL CORDOVA,<br><br>Defendant and Respondent. | B323613<br><br>(Los Angeles County<br>Super. Ct. No. 20STCV49201) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Barbara M. Scheper, Judge.  Affirmed.

The Law Office of Cliff Dean Schneider and Cliff Dean Schneider for Plaintiff and Appellant.

David L. Prince; and Miles L. Prince for Defendant and Respondent.

————————————

Appellant Shamika Townsend entered into a contract with Respondent Angel Cordova to buy his residential property in Los Angeles.  Near the close of escrow, Cordova canceled the contract due to the discovery that Property Assessed Clean Energy Program (PACE) assessment liens had been levied against the property.[1]  Townsend filed a complaint against Cordova for breach of contract and specific performance.  Cordova filed a cross-complaint for declaratory relief.  Following a bench trial, the trial court concluded there was a mutual mistake of law or fact regarding the PACE assessment liens.  The court determined the mutual mistake invalidated the contract and entered judgment in favor of Cordova.

On appeal, Townsend argues there was insufficient evidence of mutual mistake to support the judgment.  Cordova contends there was substantial evidence of mutual mistake and also of unilateral mistake of fact sufficient to invalidate the contract.  We affirm the trial court judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

In August 2020, Townsend and Cordova entered negotiations for the purchase and sale of Cordova's home.  A preliminary title report from the seller's escrow company dated August 4, 2020, indicated the property was subject to two "assessments" under the "CMFA PACE Program."  These

---

[1]     The encumbrances on the property are described in the record as "assessments," "liens," and "loans."  Whether they were properly characterized as assessments or liens was a contested issue below.  Without deciding that issue, we generally refer to the encumbrances as "assessment liens."

assessments were recorded in July 2018.[2] The preliminary title report described them as "[a]ssessments and other matters as contained in the document entitled Notice of Assessment and Payment of Contractual Assessment Required, County of Los Angeles, CMFA of a contractual Assessment under the CMFA PACE Program." For each PACE assessment, the report further stated that "reference is hereby made to said document for full particulars." The "Notice of Assessment and Payment of Contractual Assessment Required" documents referenced in the preliminary title report were admitted into evidence at trial as

---

[2]     In 2008, the California Legislature enacted a PACE program to promote energy efficient improvements to real property as a way to address global climate change. "Recognizing that the cost 'prevents many property owners from making those improvements,' it authorized 'the legislative body of any city' to 'finance' the installation of energy efficiency improvements that are permanently affixed to real property. (Sts. & Hy. Code, former § 5898.14, subds. (a)(2), (b) (Stats. 2008, ch. 159, § 2, p. 523).) The Legislature envisioned that municipalities would borrow money by selling bonds to private investors. In turn, local government would lend the money to homeowners, who would use it to pay contractors for installing energy and/or water conservation upgrades. (Sts. & Hy. Code, § 5898.22, subd. (d).) The PACE loan would be repaid by an assessment added to the homeowner's annual property tax bill, and thus secured by a priority tax lien that runs with the land." (*Morgan v. Ygrene Energy Fund, Inc.* (2022) 84 Cal.App.5th 1002, 1009, review granted February 22, 2023, S277628.) In practice, however, many local governments outsourced administration of PACE programs to private companies. These private companies took on tasks such as screening contractors, spot checking the work, and, "working through the contractors, [soliciting] homeowners to borrow." (*Id*. at p. 1010.)

exhibits 8 and 9 (Notice documents). Both are recorded with the Los Angeles County Recorder's Office.

Exhibit 8 states that the "principal" amount of $50,000 was disbursed to the record owners of the property for a total assessment amount of $59,349.09. Exhibit 9 identifies an assessment amount of $58,188.05. Both documents provide notice that once recorded, the assessments would become liens against the property. Attached to both Notice documents is an "Assessment Contract." The contracts provide that the "assessment, and each installment thereof and the interest and penalties thereon shall constitute a lien against the Property until they are paid . . . ." Both contracts bear Cordova's signature and initials.

Cordova's real estate agent, Martha Vega, negotiated the sale of the property for Cordova in 2020. Vega had the preliminary title report reflecting the PACE assessment liens at the time she was "marketing the property." Vega testified that when she received the preliminary title report, she saw it indicated there were liens, so she called Cordova. Vega eventually also went to Cordova's house and, when she was "explaining everything," Cordova told her there were no liens on the property. Vega's testimony did not establish when these conversations took place.

On August 15, 2020, Townsend made an offer to purchase Cordova's property for $550,000. On August 22, 2020, Cordova made a counteroffer regarding closing costs and other non-monetary terms, which Townsend accepted that same day.

Section 13 of the parties' contract (the contract), subsection B, provided that "[t]itle is taken in its present condition subject to all encumbrances, easements, covenants,

4

conditions, restrictions, rights and other matters, whether of record or not, as of the date of Acceptance except for: (i) monetary liens of record (which Seller is obligated to pay off) unless Buyer is assuming those obligations or taking the Property subject to those obligations . . . ." No part of the contract indicated the buyer was assuming liens or taking the property subject to any liens.

On September 1, 2020, Cordova signed a Seller Property Questionnaire form. In response to the question, "Any PACE lien (such as HERO or SCEIP) or other lien on your Property securing a loan to pay for an alteration, modification, replacement, improvement, remodel[,] or material repair of the Property?," the box for "no" is checked and Cordova's initials are at the bottom of the page. Vega testified she asked Cordova each of the questions on the Seller Property Questionnaire form and Cordova provided the answers; she only wrote the "X" marks on the form. Vega informed Cordova that his answer regarding the PACE assessment lien was "incorrect" based on the preliminary title report, but he replied that he did not owe anything and was going to resolve the issue before closing.

Cordova testified that he asked Vega to explain the Seller Property Questionnaire form to him, but Vega said everything was fine, she just wanted his initials, and, although he was "not satisf[ied]," "one, in one's innocence, does always trust people sometimes." He trusted Vega. Vega would come over to his house in a hurry, not explain anything, and tell him to sign documents. All of the documents were in English, and Cordova does not read or understand English.

Townsend learned of the PACE assessment liens after she signed the contract. She learned of them from the preliminary

title report, which she saw on or around September 2, 2020. At that time, Townsend understood that Cordova would pay the assessment liens based on section 13, subsection B., of the contract, which assigned the seller the responsibility to pay off any "liens" before closing. Townsend testified that during escrow it was "always assumed" the seller was responsible for any liens.

The parties extended the escrow period. Townsend understood the purpose of the extension was to give Cordova time to clear the PACE assessment liens. Townsend testified that it never appeared to her, nor was it stated, that the PACE assessment liens would be her responsibility. According to Townsend's real estate broker, Lisa Gillett, at the time of the extension, both she and Vega were clear the PACE obligations were "liens" that Cordova would have to pay off prior to closing. The extension was for Cordova to "understand" the assessment liens.

On October 13, 2020, Cordova sent Townsend a Cancellation of Contract, Release of Deposit, and Cancellation of Escrow form stating he "has to cancel due to a lien in property, sale may continue once the lien is clear from [the] title." Gillett testified that when Cordova wanted to terminate the contract, Vega told her "the seller wanted to resolve the issues with the lien," referring to the PACE assessment liens.

Vega testified that Cordova wanted to cancel the sale once he saw the final Settlement Statement from the escrow company and realized how little he would receive in net proceeds. Cordova told Vega that he was agreeable to paying off the outstanding mortgage on the property, but not his debt to a company called Fortifi for $61,034.42 or to Pace Funding Group, LLC for

6

$59,201.87.[3] These debts were listed on the Settlement Statement under the title "Loan Payoff." According to Vega, she showed Cordova the Settlement Statement on or around October 9, 2020. The Settlement Statement indicates Cordova's approximate net proceeds from the sale would be $27,180.20.

Cordova testified that when Vega told him he would have to pay over $100,000 to resolve the assessment liens before selling the house, he had to cancel the contract because "that wouldn't be enough for me to eat or to go someplace else." He had planned to use the proceeds from the sale to pay off the mortgage and relocate his family to Fresno. When asked about his reason for cancellation at trial, Cordova testified that he did not know what a "lien" was and that his basis for canceling was because of "fraud."

According to Cordova, the company "Green Nation Direct" had defrauded him. After Cordova bought the property in 2016, he heard a radio advertisement for a company that would "restructure or rebuild your house." He called the number in the advertisement because he wanted to build a house on the property for his daughter. After he called, a representative of Green Nation Direct came to his home. The representative returned a second time with what Cordova understood to be two loan applications, or something he understood that might have approved him for credit, or maybe both. Cordova recalls signing something on the representative's phone.

Green Nation Direct never conducted any work on the property, never performed any home improvements, and never

---

[3]    Although there was no testimony regarding Fortifi, it appears undisputed that the $61,034.42 owed to Fortifi was also PACE loan debt.

gave Cordova any money. When Cordova called Green Nation Direct to check on the status of the project, he was told the company was waiting on permits from the city. Six months later, a Green Nation Direct representative told him the company had filed for bankruptcy.

At some point, Cordova received a "large tax bill." He contacted his bank, possibly in May 2020. The bank told him he did not need to "do anything."

At trial, Cordova testified that he first learned of Green Nation Direct's "fraud" when Vega told him about the "problem with the house," referring to the PACE assessment liens. Cordova began looking for a way to "resolve the fraud." He hired an attorney to help him.

In December 2020, Townsend filed a complaint against Cordova asserting claims for breach of contract and specific performance. In March 2021, Cordova filed a cross-complaint seeking a declaration of rights as to whether the two PACE assessment liens are "to be removed, or whether the Two Assessments are to be removed and paid by Townsend once escrow closes."

The court conducted a bench trial in June 2022. Neither party requested a statement of decision. The trial court outlined its conclusions on the record. The court first observed that the PACE loan program was "wrought with fraud," including in this case. It determined the language used in the agreements between the parties created confusion, even for attorneys and real estate professionals, as to whether the PACE obligations were "assessments" or "liens." The court concluded there was a mutual mistake of "fact and/or law," without any fault of either party. The court further found Cordova only "recently"

8

discovered that over $100,000 in assessments had been levied against his property. Finally, the court concluded the contract was never properly formed due to mutual mistake, denied Townsend's request for specific performance, and entered judgment in favor of Cordova.[4]

Townsend timely appealed.

## DISCUSSION

On appeal, Townsend argues there was insufficient evidence to support the trial court's ruling rejecting her specific performance claim, based on mutual mistake. She asserts Cordova incorrectly believed he would not have to pay off the PACE assessment liens, but there was no evidence she shared that misconception. Cordova contends there was substantial evidence of both mutual mistake and, in the alternative, of his unilateral mistake, sufficient to invalidate the contract. We find substantial evidence supported the trial court judgment based on either mutual or unilateral mistake.

### I.    Standard of Review

On appeal from a judgment after a bench trial, we review the court's conclusions of law de novo and its findings of fact for substantial evidence. (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981.) "Under [the] deferential [substantial evidence] standard of review, findings of fact are liberally construed to support the judgment and we consider the evidence in the light most favorable to the prevailing party, drawing all reasonable inferences in support of the findings. [Citation.] [¶] A single

---

[4]    At the close of evidence, the court granted Cordova's motion for judgment in his favor on Townsend's breach of contract claim, due to a lack of evidence that she incurred damages from any breach of contract.

9

witness's testimony may constitute substantial evidence to support a finding. [Citation.] It is not our role as a reviewing court to reweigh the evidence or to assess witness credibility." (*Ibid*.)

Where, as here, there is no statement of decision, we apply the doctrine of implied findings, "meaning that we presume the trial court 'made all factual findings necessary to support the judgment for which substantial evidence exists in the record. In other words, the necessary findings of ultimate facts will be implied and the only issue on appeal is whether the implied findings are supported by substantial evidence.' [Citation.]" (*LSREF2 Clover Property 4, LLC v. Festival Retail Fund 1, LP* (2016) 3 Cal.App.5th 1067, 1076.) "This doctrine 'is a natural and logical corollary to three fundamental principles of appellate review: (1) a judgment is presumed correct; (2) all intendments and presumptions are indulged in favor of correctness; and (3) the appellant bears the burden of providing an adequate record affirmatively proving error.' [Citation.]" (*Acquire II, Ltd. v. Colton Real Estate Group* (2013) 213 Cal.App.4th 959, 970.)

We affirm the trial court's ruling if it was correct for any reason. (*Nelson v. Dual Diagnosis Treatment Center, Inc.* (2022) 77 Cal.App.5th 643, 665.)

## II.     Substantial Evidence of Mutual or Unilateral Mistake

### A.     Mutual mistake

A party may prove the existence of a mutual mistake to amend or rescind a contract. (Civ. Code, §§ 1567, 1640, 3399; *Hess v. Ford Motor Co.* (2002) 27 Cal.4th 516, 525 (*Hess*); *Guthrie v. Times-Mirror Co.* (1975) 51 Cal.App.3d 879, 884 (*Guthrie*).) "When both parties understand the facts other than they are, the

10

mistake necessarily is mutual and thus becomes a basis for rescission." (*Crocker-Anglo Nat. Bank v. Kuchman* (1964) 224 Cal.App.2d 490, 496.)

"Under long-standing contract law, a 'contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful.' (Civ. Code, § 1636.) Although 'the intention of the parties is to be ascertained from the writing alone, if possible' (*id*., § 1639), '[a] contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates' (*id*., § 1647)." (*Hess*, *supra*, 27 Cal.4th at p. 524.) Therefore, "[i]n determining whether a mutual mistake has occurred, a court may consider parol evidence." (*Id*. at p. 525.) "Extrinsic evidence is necessary because the court must divine the true intentions of the contracting parties and determine whether the written agreement accurately represents those intentions." (*Ibid*.)

Where the defense to enforcement of a contract is based solely on mutual mistake and the "meaning of the relevant contractual language is not in dispute," the burden is on the party asserting mutual mistake to prove it occurred. (*Hess*, *supra*, 27 Cal.4th at p. 525.) A mutual mistake may be of law or fact. (*Guthrie*, *supra*, 51 Cal.App.3d at p. 884.) "It is settled that to warrant a unilateral rescission of a contract because of mutual mistake, the mistake must relate to [a] basic or material fact, not a collateral matter." (*Wood v. Kalbaugh* (1974) 39 Cal.App.3d 926, 932.)

On appeal, Townsend asserts the evidence did not support a finding of mutual mistake because the parties did not share the same misconception. She contends that while Cordova believed

11

he did not have to pay off the assessment liens to complete the sale, she believed she would receive the property free of any liens, and this was neither a mistake nor a shared misconception.

However, we disagree that this was the only relevant evidence. The trial court explained its ruling in part by describing its findings that the underlying PACE loans appeared to be the result of fraud, and the nature of the obligation was confusing, even to attorneys and real estate professionals. Substantial evidence supported the trial court's implied finding that the parties shared a mutual misunderstanding of the status and nature of the assessment liens encumbering the property at the time the parties entered their agreement. Townsend was unaware of any unusual encumbrances on the property that might be subject to dispute. The trial court credited Cordova's testimony that he was unaware of the assessment liens encumbering the property and requiring payoff for a sale to be completed.

We therefore conclude substantial evidence supported the trial court's implied finding that the parties both understood material facts to be other than they were. The presence of a priority tax lien clouding the title was material as it affected both Cordova's ability to sell the property and the ultimate financial terms of the sale. Further, the assessment liens were alleged to be obtained by fraud and were contested. The evidence established that neither party was aware at the time the contract was formed that this type of cloud on the title existed—not a typical lien, but a disputed obligation. (See *Thrifty Payless, Inc. v. The Americana at Brand, LLC* (2013) 218 Cal.App.4th 1230, 1236, 1243 [mutual mistake adequately alleged by facts asserting neither party was aware that defendant's estimates of tenant's

12

anticipated expenses were understated]; *Garb-Ko, Inc. v. Lansing-Lewis Services, Inc.* (Mich.Ct.App. 1988) 423 N.W.2d 355, 357 [seller of property could rescind contract for sale based on mutual mistake where neither party was aware of environmental contamination on the property; trial court properly rejected buyer's claim for specific performance].) The trial court properly found mutual mistake invalidated the parties' contract.

## B. Unilateral mistake

Moreover, we agree with Cordova that even if the trial court erred in describing the evidence as demonstrating mutual mistake, the judgment was also proper based on Cordova's unilateral mistake.

A party may rescind a contract if his or her consent was given by mistake. (Civ. Code, § 1689, subd. (b)(1).) "A factual mistake by one party to a contract, or unilateral mistake, affords a ground for rescission in some circumstances." (*Donovan v. RRL Corp.* (2001) 26 Cal.4th 261, 278 (*Donovan*).) Under Civil Code section 1577, a "[m]istake of fact" is defined as "a mistake, not caused by the neglect of a legal duty on the part of the person making the mistake, and consisting in: [¶] 1. An unconscious ignorance or forgetfulness of a fact past or present, material to the contract; or, [¶] 2. Belief in the present existence of a thing material to the contract, which does not exist, or in the past existence of such a thing, which has not existed."

To establish a unilateral mistake of fact sufficient for the recission of a contract, the defendant must establish: "1) the defendant made a mistake regarding a basic assumption upon which the defendant made the contract; (2) the mistake has a material effect upon the agreed exchange of performances that is

13

adverse to the defendant; (3) the defendant does not bear the risk of the mistake; and (4) the effect of the mistake is such that enforcement of the contract would be unconscionable." (*Donovan*, *supra*, 26 Cal.4th at p. 282; *Greif v. Sanin* (2022) 74 Cal.App.5th 412, 438.)

On appeal, Townsend contends the trial court's mutual mistake ruling was in error because "at most, [the evidence] amounts to a unilateral mistake on the part of Cordova." However, Townsend contends that a unilateral mistake sufficient to rescind the contract was not proven at trial because the theory requires knowledge by the other party of the mistake at the time the contract was made and that the other party took advantage of the mistake.

Townsend's argument is incorrect. In *Donovan*, our Supreme Court expressly rejected this approach and held "California law does not adhere to the original Restatement's requirements for rescission based upon unilateral mistake of fact—i.e., only in circumstances where the other party knew of the mistake or caused the mistake. Consistent with the [California Supreme Court's decisions in earlier cases], the Restatement Second of Contracts authorizes rescission for a unilateral mistake of fact where 'the effect of the mistake is such that enforcement of the contract would be unconscionable.' (Rest.2d Contracts, § 153, subd. (a).)" (*Donovan*, *supra*, 26 Cal.4th at p. 281.)

Townsend appears to otherwise concede the evidence supported a finding of unilateral mistake. Indeed, she offered no other argument on appeal to support her assertion that the judgment cannot be affirmed on a theory of unilateral mistake. (*Los Angeles Unified School Dist. v. Torres Construction Corp.*

14

(2020) 57 Cal.App.5th 480, 497–498 [to demonstrate error appellant must provide cogent argument supported by legal analysis and citation to record; we are not required to develop appellants' arguments for them].)  We affirm the trial court judgment.

## DISPOSITION

The judgment is affirmed.  Cordova is awarded his costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ADAMS, J.

We concur:

LAVIN, Acting P. J.

EGERTON, J.