Filed 3/1/22  Unified Real Estate Investments v. Thong CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| UNIFIED REAL ESTATE INVESTMENTS, LLC, | B301162, B302953 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC691362) |
| v. | |
| PHILLIP T. THONG et al., | |
| Defendants and Respondents. | |

APPEALS from a judgment and order of the Superior Court of Los Angeles County, C. Edward Simpson and Susan Bryant-Deason, Judges.  Affirmed in part, reversed in part, and remanded with directions.

CSReeder, Christopher S. Reeder and Elan Bloch for Plaintiff and Appellant.

Wong & Mak and Fred A. Wong for Defendants and Respondents.

_____

Plaintiff Unified Real Estate Investments, LLC (landlord) appeals from a judgment in favor of defendants Phillip T. Thong, Andrea L. Thong, Ly Hua, Wendy Lam, Heng Henry Hua (Henry Hua), Newport Seafood Restaurant, Inc., Hua Culinary Group, Inc., and Newport Seafood Restaurant, Inc. (collectively, defendants).[1]

The individual defendants were shareholders in a restaurant, New Port @ Beverly Hills, Inc. (NPBH), that leased premises from landlord for a five-year term. Three years into that term, NPBH ceased operations and vacated over landlord's objection. Landlord filed suit against NPBH for breach of the lease and conversion, the latter cause of action based on allegations that NPBH wrongfully removed equipment, furniture, and other items when it vacated. Landlord sought to impose liability on defendants based on their status as officers, directors, shareholders, and/or alter egos of NPBH. Landlord further claimed Phillip Thong was liable under a personal guaranty he had provided at the outset of the lease.

NPBH did not appear and default was entered against it. The other defendants proceeded to a bench trial. The trial court ruled in favor of defendants and awarded attorney fees. The trial court further orally announced a default judgment against NPBH for unpaid rent and the items wrongfully removed from the premises. The record indicates the trial court has yet to sign that default judgment.

On appeal, landlord raises the following issues: (1) the trial court failed to issue a requested statement of decision; (2) the

---

[1] Because several of the defendants share last names, for clarity and consistency we will refer to all individual defendants by their first and last names.

2

trial court failed to include the default judgment against NPBH in the judgment entered against defendants; (3) the trial court wrongly concluded Phillip Thong's personal guaranty was no longer in effect when NPBH breached the lease; (4) the trial court erred in finding defendants not liable for conversion; (5) the trial court erred in finding defendants were not NPBH's alter egos; (6) the trial court made numerous evidentiary errors; and (7) the trial court applied the wrong standard in calculating damages in the default judgment.

The only issue before us meriting reversal is the trial court's ruling on the conversion cause of action. Henry Hua testified that he directed NPBH's move-out from the premises and admitted to removing a number of items. We hold this evidence establishes as a matter of law that Henry Hua is liable for conversion. We remand for a determination of damages. We affirm, however, the trial court's judgment in favor of the other defendants on the conversion claim.

We reject landlord's other challenges. We conclude the parties failed to request a statement of decision properly, and the trial court was not required to issue one. The trial court indicated it would enter judgment against NPBH separately from defendants, which was within its discretion to do. We agree with the trial court that Phillip Thong's personal guaranty had expired on its own terms at the time NPBH vacated the premises. The evidence did not establish as a matter of law that defendants were NPBH's alter egos. None of landlord's evidentiary challenges merits reversal. Because the trial court has yet to sign the default judgment against NPBH, the issue of damages is not properly before us.

Accordingly, we reverse the judgment as to Henry Hua and remand for a determination of damages on landlord's conversion claim against Henry Hua. Given the change in judgment, we also vacate the award of attorney fees and costs. We otherwise affirm the judgment.

## FACTUAL BACKGROUND

We provide here general background on the case. More detailed summaries of facts and proceedings appear in the relevant sections of our Discussion, *post*.

Landlord owned and operated a building at 50 North La Cienega in Beverly Hills. The building was a mixed-use commercial property, with restaurants on the first floor and medical offices on the second and third floors.

NPBH was a corporation formed in February 2014 to operate a restaurant. Its officers were Ly Hua, president, Wendy Lam, secretary, and Andrea Thong, chief financial officer, each of whom was also a shareholder. Later in 2014, Andrea Thong transferred her shares to her father, Phillip Thong, who was NPBH's accountant and "advisor." Henry Hua was the restaurant's manager and executive chef, and later became a shareholder. The other shareholders, not named as defendants here, were Mimi Hua and Linda Hua.

In February 2014, landlord leased one of the restaurant spaces at 50 North La Cienega to NPBH for a five-year term. Phillip Thong was primarily responsible for negotiating the lease on behalf of NPBH. Phillip Thong also signed a personal guaranty for the performance of the lease. As we explain in more detail in our Discussion, *post*, the guaranty provided that it would expire after the first two years of the lease term unless NPBH breached the lease within those first two years, in which

4

case the guaranty would remain in force for the remainder of the lease term and any extension thereof.

Three years into the lease, NPBH's shareholders decided to close the restaurant. On October 3, 2017, NPBH through counsel informed landlord of its intention to cease operations and return possession of the premises to landlord. Landlord's counsel responded with a letter asserting that NPBH's obligation to pay rent would continue. The letter also asserted that under paragraph 12(E) of the lease, NPBH could not remove any of NPBH's property from the premises unless it timely cured its breach.

Although there was great dispute at trial as to what items NPBH removed when it left the premises, Henry Hua acknowledged at trial that he directed the removal of some items. We summarize the evidence pertaining to the removed items in the section of our Discussion addressing landlord's conversion cause of action.

## PROCEDURAL BACKGROUND

### 1. *Complaint and trial*

On January 23, 2018, landlord filed a complaint against NPBH, Phillip Thong, Andrea Thong, Ly Hua, Wendy Lam, and Doe defendants asserting causes of action for breach of contract and conversion. The complaint alleged that Andrea Thong, Ly Hua, and Wendy Lam were officers of NPBH and Phillip Thong both promoted NPBH and had a financial interest in it. The complaint further alleged that all defendants, including the Doe defendants, were "the agents, servants, employees, principals, shareholders, joint venturers, alter egos, co-conspirators and/or partners of each other . . . ."

The complaint alleged that NPBH abandoned the premises, in the process causing damage and removing 33 items belonging to landlord including a television, fire extinguishers, "and an assortment of cooking appliances and related items" such as "a burner range, convection oven, ice maker, and refrigerator."

Phillip Thong, Andrea Thong, Ly Hua, and Wendy Lam filed an answer to the complaint on March 7, 2018. NPBH did not appear and the clerk entered default against it on August 17, 2018.

On September 12, 2018, landlord amended the complaint to substitute one individual and three entity defendants in place of the Doe defendants: Henry Hua, Newport Seafood Group, Inc., Hua Culinary Group, Inc., and Newport Seafood Restaurant, Inc. The new defendants answered the complaint on November 13, 2018.

At some point in the proceedings, landlord asserted the additional contention that Phillip Thong was liable under his personal guaranty.

Defendants unsuccessfully moved for summary judgment and the case proceeded to a bench trial. The following witnesses testified: Perry Cohan, landlord's owner and managing director; Tagel Mezgebu, landlord's building manager; Phillip Thong; Henry Hua; John Parks Landon, NPBH's real estate agent; and Bobby Lu, a restauranteur who took over the premises after NPBH left. To the extent the testimony of these witnesses is relevant to the appeal, we describe it in the applicable sections of our Discussion, *post*.

Both parties called expert witnesses on the issues of NPBH's capitalization and adherence to corporate formalities, factors pertinent to an alter ego analysis. Landlord's expert,

Kevin Henry, opined NPBH was undercapitalized and its adherence to corporate formalities insufficient, whereas defendants' expert, Barbara Luna, concluded the opposite.

## 2. *Announcement of default judgment and tentative ruling*

Following the close of evidence, the trial court announced the default judgment against NPBH, the nonappearing defendant. The court ruled that NPBH owed landlord $302,509.30 in unpaid rent, and an additional $90,000 for items NPBH removed from the premises. The court ordered landlord's counsel to prepare a proposed judgment within 10 days.

Following closing arguments, the trial court provided an oral tentative ruling regarding the appearing defendants. The trial court found that Phillip Thong was not liable on his guaranty, which was no longer in effect when NPBH vacated the premises; that landlord failed to prove defendants were NPBH's alter egos; and that although NPBH wrongly removed items from the premises, the evidence did not establish that the other defendants were involved. The trial court found in favor of defendants, and instructed defendants' counsel to prepare a proposed judgment.

We provide further details on the default judgment and tentative ruling in the applicable sections of our Discussion.

## 3. *Judgment and appeal*

On August 1, 2019, the trial court signed a judgment in favor of defendants and awarded them costs. The judgment stated that "[t]he default of [NPBH] was entered prior to trial," but does not reflect the default judgment announced at the end of trial. Landlord filed a notice of appeal from the judgment.

7

Defendants then moved for attorney fees. The trial court awarded defendants $239,962.50 in fees. Landlord filed a second notice of appeal from the fees award, and that appeal was consolidated with the first appeal.

Although the record on appeal contains a proposed default judgment against NPBH prepared by landlord, the record does not reflect the trial court has signed that judgment.

## DISCUSSION

### A. The Trial Court Was Not Required To Issue a Statement of Decision

Landlord contends the trial court committed reversible error by failing to issue a statement of decision following trial. We conclude the parties never made a proper request for a statement of decision, and therefore the trial court was not required to issue one.

#### 1. Applicable law

"[U]pon the request of any party appearing at the trial," the trial court "shall issue a statement of decision explaining the factual and legal basis for its decision as to each of the principal controverted issues at trial." (See Code Civ. Proc., § 632.) Subject to an exception not applicable here, a request for a statement of decision "must be made within 10 days after the court announces a tentative decision." (See *ibid.*) "After a party has requested the statement, any party may make proposals as to the content of the statement of decision." (*Ibid.*)

"The request for a statement of decision shall specify those controverted issues as to which the party is requesting a statement of decision." (Code Civ. Proc., § 632.) A party's failure

8

to specify that the statement of decision should address a particular issue "waive[s the] right to object to the failure of the statement of decision to do so." (*City of Coachella v. Riverside County Airport Land Use Com.* (1989) 210 Cal.App.3d 1277, 1292 (*City of Coachella*).) "[A] general, nonspecific request for a statement of decision does not operate to compel a statement of decision as to all material, controverted issues." (*Id.* at pp. 1292–1293; accord, *Conservatorship of Hume* (2006) 140 Cal.App.4th 1385, 1394.)

### 2.     Relevant proceedings below

At the conclusion of his closing argument, counsel for defendants orally requested "a statement of decision under CCP 632 and a finding of facts, particularly perhaps to address the issues that were raised in the two trial briefs that I filed."

Landlord's counsel then offered his rebuttal argument. After concluding that argument, landlord's counsel asked to make a "housekeeping note." He said, "Since we're doing a statement of decision, there's two things. One is we'll have to put the judgment in on whatever you decide in the statement of decision with the default[,] and the reason being is the one judgment rule." Landlord's counsel went on to explain his concern that if landlord obtained the default judgment against NPBH before obtaining a judgment against the other defendants, there would be a problem with the "one judgment rule." The trial court replied, "I'll leave that up to you." Landlord's counsel stated, "The way to do it is with the final judgment, if we just submit it with that, that would be fine. Obviously if the Court is going to do a statement of decision, we'd be happy to prepare a closing brief or proposed statement of decision if the Court elects." The trial court stated it did not need to receive further briefing.

9

The trial court then issued its oral tentative in favor of defendants. At the conclusion of the tentative decision, the trial court stated, "To the extent there is a request for a statement of decision, that needs to be submitted in writing, specifying the areas and the issues that the Court has not covered by its tentative ruling." The parties said nothing further regarding the statement of decision and the proceedings concluded. The record does not indicate that any party submitted any further requests for a statement of decision.

### 3.    Analysis

The record indicates that the parties never made a request for a statement of decision unequivocally specifying the issues the parties wished addressed. Defendants' counsel requested a statement of decision but was not definite about the issues to address; instead, he said "perhaps" it should address the issues raised in his trial briefs. Landlord's counsel's request was even more ambiguous, but it appears his concern was less about the content of statement of decision and more that any judgment include the default judgment against NPBH.

Given these ambiguous statements from counsel, it is unsurprising that following its tentative decision the trial court asked for a written request specifying the issues to be covered in the statement of decision. The parties did not respond to this request, although they had 10 days following the trial court's tentative decision to do so. (Code Civ. Proc., § 632.) Landlord therefore has waived any objection to the trial court declining to issue a statement of decision. (*City of Coachella*, *supra*, 210 Cal.App.3d at p. 1292.)

Landlord argues defendants' counsel's reference to the trial briefs adequately specified the issues the parties wished

addressed. Referencing an entire trial brief, without more, is not an appropriate method of specifying controverted issues for a statement of decision. Regardless, defendants' counsel's request was preliminary, stating only that the statement of decision "perhaps" should address the issues in the trial briefs. At best, this indicated defendants' counsel intent to make a more specific request in the future. No such request manifested, even when the trial court expressly asked for a more specific request.

Landlord argues a party may orally request a statement of decision, and the trial court erred by requiring a written request. Be that as it may, a valid request for a statement of decision, whether written or oral, must specify the issues to be addressed. That specificity was absent here.

Landlord's cited case, *In re Marriage of Ananeh-Firempong* (1990) 219 Cal.App.3d 272 (*Ananeh-Firempong*), does not hold otherwise. In *Ananeh-Firempong*, just prior to the trial court issuing its tentative decision, counsel orally requested a statement of decision as to "the calculations used to determine the valuation of Husband's medical practice."[2] (*Ananeh-Firempong*, at pp. 282, 284.) The trial court did not issue a statement of decision, instructing counsel, "If you wish to have [a statement of decision], you may request that in writing." (*Id.* at

_____

[2] The precise request was, " 'What I want to say is if the court in its analysis were to make a finding as to this business valuation—accepting one of these practitioners and totally rejecting the other—then I have to request that we have a staement [*sic*] of decision showing calculations so that the record is clear as to what factors were used in arriving at whatever valuation.' " (*Ananeh-Firempong*, *supra*, 219 Cal.App.3d at p. 282.)

11

p. 283.) The Court of Appeal held the oral request was sufficient and directed the trial court to provide a statement of decision on the valuation issue. (*Id.* at pp. 284–285.) *Ananeh-Firempong* is not instructive in the instant case, in which the parties never specified, orally or in writing, the issues they wished addressed in the statement of decision.

## B. The Trial Court Was Not Required To Include the Default Judgment Against NPBH in the Signed Judgment in Favor of Defendants

Landlord argues the judgment was inconsistent with the trial court's findings because it did not include the default judgment against NPBH. We reject this claim of error.

Trial courts are not required to enter judgment as to all defendants simultaneously. (Code Civ. Proc., § 579 ["In an action against several defendants, the Court may, in its discretion, render judgment against one or more of them, leaving the action to proceed against the others, whenever a several judgment is proper."].) Here, the trial court expressly ordered landlord's counsel to prepare a proposed judgment against NPBH, and ordered defendants' counsel to prepare a proposed judgment as to the claims against defendants. Thus, the trial court made clear it intended to enter two separate judgments, one for the appearing defendants and one for the defaulting defendant.

The record on appeal indicates the trial court has yet to sign landlord's proposed judgment against NPBH. Other than submitting the proposed judgment, there is no evidence in the record that landlord has taken further action to obtain a signature. We therefore decline to hold at this point that the trial court has committed any error in regard to the default judgment against NPBH.

12

The lack of a signed judgment against NPBH does not impede our jurisdiction over the appeal from the judgment against defendants. " '[I]t has long been the settled rule that in a case involving multiple parties, a judgment is final and appealable when it leaves no issues to be determined as to one party.' [Citations.]" (*Heshejin v. Rostami* (2020) 54 Cal.App.5th 984, 991.) The judgment in favor of defendants " 'leaves no issues to be determined' " as to them, and therefore is a final and appealable judgment. (*Ibid.*)

## C.     The Trial Court Correctly Concluded the Personal Guaranty Had Expired

Landlord argues Phillip Thong was liable under his personal guaranty, and the trial court erred by concluding otherwise. We agree with the trial court that at the time NPBH vacated the premises, the guaranty had expired under its own terms.

### 1.     Relevant facts and proceedings below

The lease required "Tenant to provide to the Landlord a personal guarantee for the performance of the Lease for the duration of the five (5) year Lease term."

On February 21, 2014, Phillip Thong signed a "Guaranty of Lease" (boldface omitted) in which he guaranteed NPBH's payment of rent and performance of the terms of the lease. The final paragraph of the guaranty stated, "Notwithstanding anything to the contrary contained in this Guaranty of Lease, provided there has been no Breach (as that term [is] defined in Paragraph 13.1(a) of the Lease) during the first twenty four (24) months of the Original Term, Lessor agrees that this Guaranty of Lease, effective as of the commencement of the twenty fifth (25th)

13

month of the Original Term, shall be cancelled and rendered of no further force or effect.  In the event, however, a Breach occurs during the first twenty four (24) months of the Original Term, this Guaranty of Lease, notwithstanding the foregoing, shall remain in full force and effect throughout the Original Term and any extension thereof."  The parties do not dispute that pursuant to this language, the personal guaranty would expire after two years in the absence of an earlier breach by NPBH.

At trial, Phillip Thong and Landon, NPBH's real estate agent, testified that Phillip Thong and Cohan, landlord's managing director, negotiated and agreed to the reduction of the guaranty's term from five years to two years.  Cohan testified he never agreed to the two-year term, and was not aware of the reduced term until after NPBH had vacated the premises.  Cohan acknowledged he never read the signed guaranty after receiving it.

NPBH left the premises in 2017, more than two years into the original term of the lease.  At issue in the trial court was whether the guaranty was still in effect at that time.  This determination turned on whether NPBH had committed an earlier breach during the first two years of the lease, which would have extended the duration of the guaranty.

Landlord argued below that the guaranty itself breached the lease, because the guaranty had a two-year duration rather than the five years required by the lease, and NPBH did not provide a new guaranty when the first guaranty expired to cover the remaining three years.  Landlord further argued NPBH had breached a provision of the lease requiring NPBH to clean the drain pipes every six months.

The trial court disagreed, concluding there could be no breach unless the landlord first notified NPBH of the purported noncompliance. In its oral tentative ruling, the trial court cited paragraph 19(A) of the lease, which provides, "The occurrence of anyone [*sic*] or more of the following events ('Events of Default') shall constitute a material default and breach of this Lease by Tenant." Subparagraph (4) lists as one of the "Events of Default," "[t]he failure of Tenant to promptly and faithfully observe or perform any of the covenants, conditions or provisions of this Lease to be observed or performed by Tenant, where such failure shall continue for a period of ten (10) days after written notice thereof from Landlord to Tenant . . . ."

The trial court found no evidence that landlord had provided notice within the first two years of the lease term that NPBH had failed to provide an adequate guaranty or had failed to clean the drain pipes. Accordingly, it found that NPBH had not breached the lease within the first two years, and therefore Phillip Thong was not liable under the guaranty.[3]

### 2. Analysis

On appeal, landlord does not dispute the trial court's finding that landlord did not within the first two years of the lease term notify NPBH of either the insufficiency of the guaranty or the failure to clean the drain pipes. Rather, landlord contends the trial court misinterpreted the lease and guaranty to

---

[3] The trial court rejected defendants' argument that to the extent the guaranty was not compliant with the lease, there was no meeting of the minds and thus no valid guaranty. Defendants do not reassert this argument on appeal, and we do not address it.

require notice to establish a breach. This is a question of contractual interpretation on undisputed facts, and our review is de novo. (*Bravo v. RADC Enterprises, Inc.* (2019) 33 Cal.App.5th 920, 922.)

The guaranty by its language expired in two years absent a breach as that term is defined in paragraph 13.1(a) of the lease. The guaranty is not a model of clarity, because the lease does not in fact contain a paragraph 13.1(a). Paragraph 13(A) of the lease, however, entitled "Indemnity" (boldface omitted), refers to breach, stating in relevant part, "Tenant shall further indemnify and hold Landlord harmless from and against any and all claims, costs, expenses and liabilities (including reasonable attorney's fees) arising from, or incurred in connection with, any breach of, or default in, the performance of any obligation on Tenant's part to be performed under the terms of this Lease . . . ."

To understand the meaning of "breach" as used in paragraph 13(A), the trial court appropriately looked to paragraph 19(A), listing the events that "constitute a material default and breach of this Lease." Subparagraph (4) states that one such event is the failure of NPBH to perform the provisions of the lease "where such failure shall continue for a period of ten (10) days after written notice thereof from Landlord." This language establishes that NPBH's noncompliance with a provision of the lease does not in itself constitute a "material default and breach"—rather, breach occurs only after the landlord has notified NPBH of the noncompliance, and NPBH has failed to cure the issue within 10 days of that notice. In other

16

words, notice from the landlord is a necessary predicate to a breach.[4]

The trial court found, and landlord does not dispute, that landlord did not notify NPBH of any noncompliance within the first two years of the lease term. Thus, NPBH did not breach the lease within the first two years of the lease term, and the guaranty was no longer in effect when NPBH abandoned the premises in 2017.

Landlord contends that several provisions of the guaranty obviate the need for notice to establish a breach. First, the guaranty states, "This Guaranty shall not be released, modified or affected by the failure or delay on the part of [landlord] to enforce any of the rights or remedies of the [landlord] under said Lease, whether pursuant to the terms thereof or at law or in equity." Landlord argues that through this provision, Phillip Thong waived any challenge based on landlord failing to make a timely demand on NPBH.

We disagree. The two-year expiration provision applies "[n]otwithstanding anything to the contrary contained in this Guaranty of Lease." Thus, to the extent it is in conflict with the provision cited by landlord, it supersedes that other provision.

Landlord also cites provisions in the guaranty stating, "No notice of default need be given to Guarantors" and landlord "may proceed immediately against [NPBH] and/or against Guarantors

---

[4] The lease lists certain "Events of Default" not subject to the 10-day notice requirement under paragraph 19(A)(4), namely abandonment of the premises, failure to make rent or other payments, and involuntary assignment of the tenant's interest in the lease. Landlord does not contend any of these events occurred in the first two years of the lease term.

following any breach or default by [Tenant] or for the enforcement of any rights which [landlord] may have as against [NPBH] under the terms of the Lease or at law or in equity." Further, "[landlord] shall have the right to proceed against Guarantors hereunder following any breach or default by [NPBH] without first proceeding against [NPBH] and without previous notice to or demand upon either [NPBH] or Guarantors."

These provisions establish that *in the event of a breach or default*, landlord may proceed against the guarantors without notice to either NPBH or the guarantors. For these provisions to apply, however, there must first be a breach or default under the lease. As discussed, a breach or default occurs only if the landlord has first notified NPBH of NPBH's noncompliance, and NPBH has not cured the issue within 10 days. In other words, although the *guaranty* requires no notice before landlord may enforce it following a breach, the *lease* requires notice to NPBH to establish the breach in the first place.

Landlord further argues the provisions of the lease itself establish no notice is necessary to trigger a breach as defined in the guaranty. Landlord suggests the leases's "no waiver" clause either obviates the notice requirement in paragraph 19(A)(4) or bars NPBH or Phillip Thong from asserting it. That provision states, in relevant part, that "[n]o delay or omission in the exercise of any right or remedy of Landlord with respect to any default by Tenant shall impair such right or remedy or be construed as a waiver thereof."

We reject landlord's interpretation. As applicable here, the "no waiver" clause arguably would entitle landlord to serve notice of NPBH's noncompliance at any time, even long after the noncompliance occurred, thus triggering the 10-day clock under

18

paragraph 19(A)(4). Landlord still would have to serve notice to establish breach, however. As discussed, landlord did not serve notice of any noncompliance during the first two years of the lease term. Thus, NPBH was not in breach during those first two years.

Landlord argues the term "breach" as used in the guaranty is different from the "Events of Default" under paragraph 19(A) of the lease. This argument runs afoul of the express language of Paragraph 19(A), which states "[t]he occurrence of anyone [*sic*] or more of the following events ('Events of Default') shall constitute a material default *and* breach of this Lease by Tenant." (Italics added.) This language establishes that whatever distinction may be drawn between a default and a breach, the events triggering them nonetheless are identical, including the notice requirement under subparagraph (4).

Landlord cites paragraph 10(A)(5) of the lease, providing "If Tenant is served with a Notice for any kind of breach, Landlord shall have the right to enter the Premises at any time after which such notice is posted." Landlord argues that "this language contemplates a separate existence between what constitutes a breach of the Lease Agreement and the notice requirement to proceed with any sort of enforcement action or create the existence of an Event of Default."

Paragraph 10(A)(5) describes the conditions under which the landlord may enter the premises, a separate issue from the notice required to establish a breach, the latter of which is addressed in paragraph 19(A)(4). Paragraph 10(A)(5) is not instructive on the interpretation of the term "breach." Again, landlord's suggestion that breach is something other than the

19

events described in paragraph 19(A) is belied by the express language of that paragraph.

Landlord notes, as have we, that the guaranty in defining breach does not cross-reference paragraph 19(A) of the lease, but rather paragraph 13, which refers to "any breach of, or default in" NPBH's performance under the lease. Landlord claims "this section appears to distinguish between the mere existence of a breach in the performance of a condition of the Lease Agreement and notice."

We see nothing inconsistent between paragraph 13 and paragraph 19 of the lease, nor can we conceive how we may understand the meaning of "breach" in paragraph 13 without looking to paragraph 19, which defines the events constituting breach. The guaranty is sufficiently clear that it intends to incorporate the definition of breach from the lease, despite not explicitly cross-referencing paragraph 19.

Landlord argues it was unaware that Phillip Thong had provided a guaranty for a shorter term than the lease required, and cannot have been required to provide notice "of a breach that was concealed, or upon which [landlord] was unaware." This argument disregards the contrary testimony at trial that landlord expressly agreed to the term reduction, which we must assume the trial court found credible. (*LSREF2 Clover Property 4, LLC v. Festival Retail Fund 1, LP* (2016) 3 Cal.App.5th 1067, 1076 (*Clover Property*) [absent a statement of decision, reviewing court "presume[s that] the trial court 'made all factual findings necessary to support the judgment for which substantial evidence exists in the record'"].) Regardless, the reduction of the guaranty's term was not "concealed," but was apparent on the face of the guaranty. It is no defense that the landlord accepted

20

the guaranty without reading it.  Landlord cites no authority to the contrary.

In its reply brief, landlord argues the trial court committed reversible error by failing to rule properly on landlord's motion in limine seeking to bar defendants from raising a meeting-of-the-minds defense to the guaranty or from arguing that their negotiations with landlord shortened the guaranty's term.  Any such error was harmless, because our holding does not depend on a meeting-of-the-minds argument or the trial court's findings regarding the parties' negotiations.  Rather, we rely on the undisputed facts and plain language of the lease and guaranty.

**D.    The Trial Court Erred by Not Finding Henry Hua Liable for Conversion, But the Record Supports the Court's Ruling in Favor of the Other Defendants on That Cause of Action**

Landlord contends the evidence at trial established that defendants, through NPBH, wrongfully removed equipment and other items when NPBH vacated the premises, and the trial court erred in concluding defendants were not liable for conversion.  We agree the evidence at trial established as a matter of law that Henry Hua, who admitted to removing items from the premises, was liable for conversion, and the trial court erred by concluding otherwise.  We, however, conclude that substantial evidence supported the trial court's finding in favor of the other defendants on the conversion claim.

We begin with a summary of the proceedings below, including the relevant evidence at trial and the trial court's oral ruling.

### 1. Proceedings below

#### a. *Evidence presented*

The summary of each witness' testimony is organized for clarity and therefore is not necessarily in the order in which the witness provided the testimony.

##### i. *Testimony of Perry Cohan*

Cohan, landlord's managing director, testified that before NPBH moved into the premises, landlord had installed $42,000 of new kitchen equipment from Alpine Fixtures & Sheet Metal, Inc. (Alpine). After NPBH entered into the lease, NPBH began modifying the space and installing equipment and furniture. No one from NPBH ever told Cohan to remove any of the Alpine equipment.

When NPBH vacated the premises, Cohan entered the space and discovered nearly everything had been removed, and there was damage to the walls and floors. NPBH never returned any equipment to landlord.

Cohan never personally saw anyone remove the equipment NPBH had installed.

Cohan believed the wrongfully removed equipment fell into two categories: the Alpine equipment that was in the space when NPBH moved in, and the equipment NPBH installed itself.

##### ii. *Testimony of Tagel Mezgebu*

Mezgebu, landlord's building manager, testified that landlord installed equipment from Alpine before NPBH moved in. Mezgebu identified photographs he had taken of the space with the Alpine equipment installed, again before NPBH had moved in.

NPBH renovated the space before moving in. All of the Alpine equipment was removed during the renovation, replaced by equipment for preparing Chinese cuisine. Mezgebu initially testified no one from NPBH asked him to remove any equipment, but later he said he did not remember if anyone had asked him.

When NPBH was moving out of the space in 2017, Mezgebu saw the movers taking out a stainless steel table. Mezgebu told Henry Hua, who was present, that the table was part of the bar. Henry Hua said he would put it back. Apart from the bar table, Mezgebu did not witness anyone remove anything else.

Mezgebu testified that when he entered the space after NPBH had left, "about 95 percent of the stuff" was gone. Mezgebu took pictures of the space after NPBH vacated, and those pictures were entered as exhibits at trial.

### iii.     Testimony of Phillip Thong

Phillip Thong testified that the equipment landlord had previously installed in the space was unsuitable for NPBH's purposes and had to be taken out. He presented an architect's plan to Cohan that called for gutting the kitchen and replacing all the equipment. Cohan approved the plan and agreed to remove the existing equipment. Ly Hua and Henry Hua then tagged the equipment to be removed with blue tape. Phillip Thong asked Mezgebu at least two or three times to remove the tagged equipment, but Mezgebu did not do so.

Phillip Thong testified regarding a general ledger for NPBH as of December 31, 2017, with entries for "disposal . . . due to close of business" of leasehold improvements, fixed assets, furniture and fixtures, and computers. (Capitalization omitted.) Phillip Thong explained, "[W]hen a company no longer has assets or abandons those assets, you write it off from the books in

closing as the company no longer has any assets." Phillip Thong stated nothing physically had to happen to the assets for the write-off to take place. Leasehold improvements would have been left at the premises because they could not be removed. Their value would be reduced to zero on the financial statement because the company cannot take the improvements upon vacating the premises.

Another entry in the ledger indicated that inventory had been transferred to "San Gabriel location." (Some capitalization omitted.) Phillip Thong explained that another New Port entity had sold inventory to NPBH, and when NPBH shut down it returned the goods to the other entity, resulting in a write-off of approximately $8,700.

### iv. Testimony of Henry Hua

Henry Hua testified that he was in charge of NPBH moving out of the premises, and he identified for the movers what to remove. His summarized his instructions as follows: "I told them if it was loose to pack it. If it was something we can unplug, pack it. If it was something that was, like, an electrical plug, we can unplug it and take it with us. Anything that wasn't bolted to the floor, to the wall, don't take it [*sic*].[5] Last thing, when they moved, don't damage the building, please."

Henry Hua took photographs after the moveout was completed. The set of photographs was admitted as an exhibit. Looking at the photographs, Henry Hua described some items the movers had taken, such as a fish tank, some booth seating, some loose shelving, and a timeclock for employees to punch in and out.

---

[5] We presume Henry Hua meant to say that he instructed the movers *not* to take anything bolted to the floor.

NPBH had leased two dishwashers from outside vendors, and at NPBH's request the vendors removed the dishwashers from the premises. Henry Hua testified the movers left behind a custom built Chinese kitchen including woks, stock pots, a giant cooling table, a steam deck station, a three-compartment sink, and a prep sink, although he did not identify these items at trial in the photographs he took, nor was he asked to do so.

Henry Hua acknowledged at trial that some items were taken to a warehouse in San Gabriel, but he did not specify which items.

After NPBH vacated the premises, landlord's counsel sent a letter to NPBH's counsel listing 33 items of equipment landlord believed NPBH had removed. Henry Hua read the letter and did not recognize any of the listed items other than a television and four fire extinguishers. NPBH had purchased the fire extinguishers for the premises. Through a letter from NPBH's counsel, Henry Hua offered to return the television and fire extinguishers to the premises, but he did not recall landlord responding. He never went to the premises to return the television and fire extinguishers.

### v. *Testimony of Bobby Lu*

Lu, the restauranteur who took over the space after NPBH left, testified that when he took possession, the kitchen contained a stove, a shell of refrigeration, a small sink for handwashing, and a work counter.

### b. *Trial court's ruling*

As discussed, the trial court did not issue a statement of decision. It provided an oral tentative decision, which also incorporated earlier comments the trial court made the court day

prior. It also orally explained the basis for the default judgment against NPBH. We summarize all of these comments below.

In summarizing the trial court's oral comments, we do not suggest they are a substitute for a statement of decision, or provide a basis to affirm or reverse any part of the judgment. "[A] court's oral comments may be valuable in illustrating the trial judge's theory, but they may never be used to impeach the order or judgment on appeal. [Citation.] This is because a trial court retains inherent authority to change its decision, its findings of fact, or its conclusions of law at any time before entry of judgment and then the judgment supersedes any memorandum or tentative decision or any oral comments from the bench." (*Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 268 (*Shaw*).)

### i. Trial court's "initial thoughts"

Following the close of evidence, and before closing argument, the trial court provided some "initial thoughts." The trial court found Cohan's testimony "vague," in that "[h]e didn't know what happened to his equipment. He didn't know what equipment [NPBH] provided." The trial court also found Mezgebu's testimony "rather limited and not in great detail." Phillip Thong, in contrast, "seemed to have more of a command of personal knowledge as to what he testified to," and "[h]e was specific in his testimony on the removal of the landlord's kitchen equipment and why it needed to be removed and what it was replaced by." The court found "Henry Hua's testimony was primarily consistent with that of Mr. Thong."

After addressing other issues in the case, the trial court stated, "As far as the removal of the equipment by [NPBH] when they vacated the premises, that shouldn't have happened. It was

26

clearly a violation of the lease. Their right to remove their equipment was contingent upon their vacating the premises without having breached the lease. Here it is clear that they breached the lease by vacating the premises before the term expired and as a result did not have the contractual right to remove that equipment." The court found, however, that there was weak evidence, if any, as to the value of the missing equipment, and no admissible testimony as to what the landlord had to spend to restore the premises to a marketable condition.

*ii. Oral explanation of default judgment*

The trial court began the next court day by announcing the default judgment against NPBH. The court ruled that NPBH owed landlord $302,509.30 in unpaid rent. The court continued, "There's testimony and evidence that some equipment and furniture was removed," and "even though there was no direct testimony on its value," the trial court opted to determine its value based on an NPBH balance sheet as of year-end 2017, which listed figures "for equipment and for furniture and fixtures and also the accumulated depreciation."

The balance sheet to which the trial court referred, under the heading "Fixed Assets," had line items for "Leasehold Improvement," "Equipment," "Furniture & Fixtures," and "Computers," and then a line for accumulated depreciation and amortization. The amount attributed to "Equipment" was $133,100.80, and the amount attributed to "Furniture & Fixtures" was $122,622.44. The total depreciation and amortization for all fixed assets was listed as –$162,544.00.

The trial court stated, "I've taken the figure for furniture and fixtures because the only equipment that I believe the testimony supported that was removed was the leased

27

equipment. I have added an additional $90,000 to the default judgment for the removal of the furniture," for a total judgment of $392,590.30.

### iii. *Tentative decision*

Following closing arguments, the trial court orally announced its tentative ruling, beginning by incorporating its preliminary thoughts from the previous court day summarized above.

On the issue of NPBH's removal of items from the premises, the trial court found "no reliable evidence of the value or damage to [landlord]. There's been no evidence that any of the defendants other than [NPBH] actually removed any of the equipment." The court found that the equipment "was removed by individuals that were hired by [NPBH]."

## 2. Standard of review

Landlord's argument on appeal primarily consists of listing evidence presented at trial and arguing that evidence establishes defendants' liability for conversion.[6] "Although we ordinarily review evidentiary challenges for substantial evidence, that

---

[6] Landlord also contends the trial court failed to apply a strict liability standard when evaluating landlord's conversion cause of action. Although landlord states this argument is supported by the trial court's tentative ruling and ultimate judgment, landlord fails to cite any portions of the tentative ruling or judgment indicating the trial court applied the wrong standard. Our own review of the record, moreover, gives no indication that the parties raised any arguments that turned on the proper application of that standard. We therefore reject this argument.

28

standard ' "is typically implicated when a defendant contends that the plaintiff succeeded at trial in spite of insufficient evidence." ' [Citations.] ' "In the case where the trier of fact has expressly or implicitly concluded that the party with the burden of proof did not carry the burden" ' . . . and that party appeals, ' "the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law." ' [Citation.]" (*Manela v. Stone* (2021) 66 Cal.App.5th 90, 105 (*Manela*).)

Here, landlord, as plaintiff, had the burden to prove each element of its cause of action for conversion. (Evid. Code, § 500 ["a party has the burden of proof as to each fact the existence or nonexistence of which is essential to the claim for relief or defense that he is asserting"].) Our inquiry therefore is whether the evidence establishes as a matter of law that defendants are liable for conversion. In the absence of a statement of decision, we apply the doctrine of implied findings, and "presume the trial court 'made all factual findings necessary to support the judgment for which substantial evidence exists in the record.' " (*Clover Property*, *supra*, 3 Cal.App.5th at p. 1076.)

### 3.    Analysis

The tort of conversion consists of three elements: "(a) plaintiff's ownership or right to possession of personal property, (b) defendant's disposition of property in a manner inconsistent with plaintiff's property rights, and (c) resulting damages.' [Citations.]" (*Voris v. Lampert* (2019) 7 Cal.5th 1141, 1150 (*Voris*).) To establish the first element, " '[n]either legal title nor absolute ownership of the property is necessary. [Citation.] A party need only allege it is "entitled to immediate possession at the time of conversion. [Citations.]" [Citation.] . . . '

29

[Citation.]" (*Plummer v. Day/Eisenberg, LLP* (2010) 184 Cal.App.4th 38, 45, italics omitted.)

"[C]onversion is a strict liability tort. It does not require bad faith, knowledge, or even negligence; it requires only that the defendant have intentionally done the act depriving the plaintiff of his or her rightful possession." (*Voris*, *supra*, 7 Cal.5th at p. 1158.) Further, "[a]n agent is guilty of conversion, even if he acts in good faith and in accord with his instructions, if his principal is guilty of conversion." (*Wells Fargo Bank & Union Trust Co. v. Dowd* (1956) 139 Cal.App.2d 561, 575 (*Wells Fargo Bank & Union Trust*).)

### a. *The record compels the conclusion that Henry Hua is liable for conversion*

The trial court in its tentative ruling stated there was "no evidence that any of the defendants other than [NPBH] actually removed any of the equipment." This comment is not supported by the record, because Henry Hua expressly testified that he was in charge of the move-out, and instructed the movers what to take. He described a number of the items he ordered removed. He acknowledged he read the letter from landlord listing missing items, and admitted he removed the television and fire extinguishers. Although he offered to return them, he did not do so.

Evidence may compel a finding as a matter of law when it is " ' (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding." ' [Citation.]" (*Sonic Manufacturing Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 466 (*Sonic*).) Henry Hua's testimony that he was responsible for the removal of items

from the premises certainly was uncontradicted and unimpeached, and in fact was corroborated by other evidence.[7]

It is not clear from the record whether the items removed by Henry Hua were items originally installed by the landlord, items purchased by NPBH, or both. The distinction is immaterial to our analysis. It is undisputed that under the terms of the lease, upon NPBH's breach landlord assumed ownership or a right to possession of all of NPBH's property on the premises. Paragraph 12(E) of the lease states, in relevant part, "All articles of personal property and all business and trade fixtures, machinery and equipment, furnishings, furniture and movable partitions owned or placed in the Premises by Tenant at Tenant's expense shall be and remain the property of Tenant and may be removed by Tenant at any time during the Lease Term *provided Tenant is not in material default hereunder . . . .*" (Italics added.)

Our Supreme Court has held that an analogous lease provision prohibiting a "Lessee . . . in default" from "removing . . . trade fixtures, equipment, and other like property which it may have installed" is "reasonably susceptible of the construction that upon the lessees' default the trade fixtures shall belong to . . . lessors . . . ." (See *Goldie v. Bauchet Properties* (1975) 15 Cal.3d 307, 311, fn. 3, 318 (*Goldie*).)[8]

---

[7] Defendants in their respondent's brief argue the only evidence supporting Henry Hua's direct liability for conversion was Mezgebu's testimony that Henry Hua was at the move-out and said he would return a table at Mezgebu's request. Defendants fail to address Henry Hua's own testimony about the move-out.

[8] The full text of the provision at issue in *Goldie* reads, " 'All trade fixtures, equipment and other like property which the Lessee has installed in or attached to the building or

In *Goldie*, the Supreme Court could not determine as a matter of law that the quoted language served to transfer ownership of the lessees' property to the lessors upon breach, and remanded for the trial court to determine the intent of the parties. (*Goldie*, *supra*, 15 Cal.3d at pp. 318–319.) In the instant case, however, defendants did not contest below landlord's assertion that paragraph 12(E) granted landlord a possessory interest in NPBH's property upon breach, nor did they contest it in their respondent's brief. We deem the matter conceded and forfeited.

Thus, even if the only items removed by Henry Hua were items originally belonging to NPBH, under the terms of the lease

---

improvements located upon the demised premises, provided the removal of the same shall not structurally injure the building or improvements, shall remain the property of the Lessee, subject to Lessor's security interest, and the Lessor agrees that the Lessee shall have the option at any time, and from time to time, provided the Lessee is not then in default in the performance of any of the obligations of the lease on its part to be performed to trade in or replace any and all of its trade fixtures, equipment, and other like property which it may have installed in the building or improvements, and upon the termination of the lease, to remove same, provided that upon such trading in, replacing or removing the Lessee shall restore and repair any damage occasioned thereby to the building and improvements, and further provided that if Lessee be in default, it shall not then have any right of trading in, replacing or removing of such trade fixtures, equipment, and other like property which it may have installed. Nothing in this Article shall be deemed to permit the removal by the Lessee of any permanent type exterior or interior carrying walls, or permanent type floor coverings.'" (*Goldie*, *supra*, 15 Cal.3d at p. 311, fn. 3.)

landlord assumed possession of those items when NPBH abandoned the premises and breached the lease. Henry Hua's removal of those items, therefore, constituted conversion. This is so regardless of whether Henry Hua was ignorant of paragraph 12(E), or was acting in good faith on instructions from someone else. (*Voris*, *supra*, 7 Cal.5th at p. 1158; *Wells Fargo Bank & Union Trust*, *supra*, 139 Cal.App.2d at p. 575.)

Because the trial court did not find Henry Hua liable for conversion, the trial court made no findings as to what precisely Henry Hua removed or ordered removed and the damages therefrom. We acknowledge the trial court orally announced a default judgment against NPBH that included $90,000 in damages for removal of items from the premises. Assuming the trial court ultimately signs the judgment containing that award, it does not compel the conclusion that the trial court necessarily found that Henry Hua removed or directed others to remove property belonging to landlord worth $90,000.[9] In the absence of a statement of decision, it is unclear whether the $90,000 solely reflects the items removed by Henry Hua or at his direction, or incorporates items for which Henry Hua is not responsible.

It is necessary, therefore, to remand to the trial court for a determination of damages attributable to Henry Hua's actions. We leave it to the trial court to decide in the first instance how best to accomplish this.

---

[9] We express no opinion as to the validity of the damages award announced by the trial court.

### b. *The record does not compel the conclusion that the other defendants are liable for conversion*

Whereas the record unequivocally established that Henry Hua removed or directed others to remove items from the premises, there was no such evidence for any of the other defendants. The only other defendant to testify, Phillip Thong, did not admit to being involved in the move-out, nor did any of the other witnesses or documentary evidence indicate any defendant other than Henry Hua was involved in removing items.

It is true that Phillip Thong testified regarding removing equipment when NPBH renovated the premises at the outset of the lease, but it was not clear from his testimony whether NPBH removed the items or landlord did. Phillip Thong further testified Cohan approved of the removal of the items. This testimony supports the inference that landlord consented to or participated in the removal of items at the outset of the tenancy, which defeats a claim of conversion. (*Chen v. PayPal, Inc.* (2021) 61 Cal.App.5th 559, 576 [" ' there can be no conversion where an owner either expressly or impliedly assents to or ratifies the taking, use or disposition of his property' "].)

Landlord argues that as officers, directors, and/or shareholders of NPBH, defendants can be liable for the acts of the corporation. Landlord cites case law stating that "[d]irectors are jointly liable with the corporation and may be joined as defendants if they personally directed or participated in the tortious conduct" (*Frances T. v. Village Green Owners Assn.* (1986) 42 Cal.3d 490, 504), and shareholders similarly may be liable if they "specifically directed or authorized the wrongful

34

acts" (*Wyatt v. Union Mortgage Co.* (1979) 24 Cal.3d 773, 785). Such individuals may also be liable if "they specifically knew or reasonably should have known that some hazardous condition or activity under their control could injure plaintiff," yet "negligently failed to take or order appropriate action to avoid the harm." (*Frances T.*, at p. 508.)

Landlord argues that "the improper removal of these items was intended to benefit the entire group of [defendants] and therefore all [defendants] should be liable for the converted property." Landlord further argues that defendants are liable because they "collectively elected to shut down the operations of NPBH" and thus "authorized the conversion of property . . . by appointing Henry Hua to remove contents from the Premises." Landlord also contends defendants "ratif[ied]" the wrongful removal "by failing to return stolen items following demand for their return by Unified," and "specifically knew and reasonably should have known that actions taken within their control injured [landlord]."

As an initial matter, landlord's argument casts too wide a net by lumping defendants together as a group. No evidence was presented that the entity defendants had any control over or owned shares in NPBH. Nor was there any evidence establishing that as a matter of law the entity defendants were involved in the move-out or received property to which landlord had a right to possession. Henry Hua admitted items were taken to a warehouse in San Gabriel, but no evidence was introduced as to who controlled that warehouse. Phillip Thong testified that when NPBH closed, it returned $8,700 of inventory to one of the entity defendants, but the evidence did not establish as a matter of law that this happened after NPBH had breached the lease by

abandoning the premises. The date listed for that transaction in NPBH's ledger, December 31, 2017, could just as well have reflected the date the transaction was entered for recordkeeping purposes at the end of the year, rather than the date of the transaction itself.

As for the individual defendants other than Henry Hua, again, there was no evidence establishing as a matter of law that they directed, authorized, or participated in the move-out or the removal of landlord's property. Their agreement as a group to close the restaurant does not establish that they also agreed as a group to remove items from the premises. Although there was correspondence between landlord's counsel and NPBH's counsel about the purportedly removed items, this does not compel the conclusion that any of the individual defendants apart from Henry Hua were aware of that correspondence—indeed, based on Henry Hua's testimony, it appeared that he handled the matter.

At bottom, the standard of review defeats landlord's arguments here. Whether or not there was evidence from which the trial court might have concluded that some or all of the defendants directed, participated in, or otherwise were aware of NPBH's removal of items from the premises, no evidence compels this conclusion as a matter of law. Landlord's argument therefore must fail.

E.    The Record Does Not Establish as a Matter of Law That Defendants Were Alter Egos of NPBH

Landlord contends it "presented overwhelming evidence" that defendants were alter egos of NPBH, and the trial court erred by ruling otherwise. We reject this challenge.

### 1.   Applicable law and standard of review

"Ordinarily, a corporation is regarded as a legal entity, separate and distinct from its stockholders, officers and directors, with separate and distinct liabilities and obligations.  [Citations.] A corporate identity may be disregarded—the 'corporate veil' pierced—where an abuse of the corporate privilege justifies holding the equitable ownership of a corporation liable for the actions of the corporation." (*Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 538.)

" 'Alter ego is an extreme remedy, sparingly used. [Citation.]' [Citations.]" (*Hasso v. Hapke* (2014) 227 Cal.App.4th 107, 155 (*Hasso*).)  A "heavy burden rests on the shoulders of the party seeking to pierce the corporate veil." (*Santa Clarita Organization for Planning & Environment v. Castaic Lake Water Agency* (2016) 1 Cal.App.5th 1084, 1105 (*Santa Clarita Organization for Planning & Environment*).)  " '[T]he corporate form will be disregarded only in narrowly defined circumstances and only when the ends of justice so require.' [Citation.]" (*Zoran Corp. v. Chen* (2010) 185 Cal.App.4th 799, 810 (*Zoran Corp.*).)

" '[T]wo conditions must be met before the alter ego doctrine will be invoked.  First, there must be such a unity of interest and ownership between the corporation and its equitable owner that the separate personalities of the corporation and the shareholder do not in reality exist.  Second, there must be an inequitable result if the acts in question are treated as those of the corporation alone.' [Citations.]" (*Hasso, supra*, 227 Cal.App.4th at p. 155.)

Courts consider a number of factors when determining whether to apply the alter ego doctrine, including but not limited to, " ' "[c]ommingling of funds and other assets, failure to

37

segregate funds of the separate entities, and the unauthorized diversion of corporate funds or assets to other than corporate uses . . . ; . . . the treatment by an individual of the assets of the corporation as his own . . . ; . . . the failure to obtain authority to issue stock or to subscribe to or issue the same . . . ; . . . the holding out by an individual that he is personally liable for the debts of the corporation . . . ; the failure to maintain minutes or adequate corporate records, and the confusion of the records of the separate entities . . . ; . . . the identical equitable ownership in the two entities; the identification of the equitable owners thereof with the domination and control of the two entities; identification of the directors and officers of the two entities in the responsible supervision and management; sole ownership of all of the stock in a corporation by one individual or the members of a family . . . ; . . . the use of the same office or business location; the employment of the same employees and/or attorney . . . ; . . . the failure to adequately capitalize a corporation; the total absence of corporate assets, and undercapitalization . . . ; . . . the use of a corporation as a mere shell, instrumentality or conduit for a single venture or the business of an individual or another corporation . . . ; . . . the concealment and misrepresentation of the identity of the responsible ownership, management and financial interest, or concealment of personal business activities . . . ; . . . the disregard of legal formalities and the failure to maintain arm's length relationships among related entities . . . ; . . . the use of the corporate entity to procure labor, services or merchandise for another person or entity . . . ; . . . the diversion of assets from a corporation by or to a stockholder or other person or entity, to the detriment of creditors, or the manipulation of assets and liabilities between entities so as to

38

concentrate the assets in one and the liabilities in another . . . ; . . . the contracting with another with intent to avoid performance by use of a corporate entity as a shield against personal liability, or the use of a corporation as a subterfuge of illegal transactions . . . ; . . . and the formation and use of a corporation to transfer to it the existing liability of another person or entity." . . . ' [Citations.]" (*Zoran Corp.*, *supra*, 185 Cal.App.4th at pp. 811–812.) " 'No single factor is determinative, and instead a court must examine all the circumstances to determine whether to apply the doctrine. [Citation.]' [Citation.]" (*Id.* at p. 812.)

"Whether a party is liable under an alter ego theory is normally a question of fact. [Citations.] 'The conditions under which the corporate entity may be disregarded, or the corporation be regarded as the *alter ego* of the stockholders, necessarily vary according to the circumstances in each case inasmuch as the doctrine is essentially an equitable one and for that reason is particularly within the province of the trial court.' [Citation.]" (*Zoran Corp.*, *supra*, 185 Cal.App.4th at p. 811.)

We review a trial court's findings regarding alter ego for substantial evidence. (*Santa Clarita Organization for Planning & Environment*, *supra*, 1 Cal.App.5th at p. 1095.) Because landlord bore the burden at trial of proving alter ego, landlord can prevail on this issue only if the evidence establishes as a matter of law that defendants were alter egos of NPBH. (*Manela*, *supra*, 66 Cal.App.5th at p. 105.)

### 2. Trial court's tentative ruling

For the reader's information, we briefly summarize the trial court's tentative ruling on the issue of alter ego, although we do not rely on that ruling in resolving this appeal. (See *Shaw*, *supra*, 170 Cal.App.4th at p. 268.)

39

The court found a lack of evidence that defendants commingled funds or exercised dominance and control over NPBH. The court noted a lack of evidence as to particular shareholders' participation in the business, including Ly Hua and Wendy Lam. As for Henry Hua, "[t]here's been no evidence that he commingled any of his funds with the funds of the restaurant or that he exercised any control over the restaurant so as to benefit himself personally rather than the corporate entity." As for Phillip Thong, "there's been no testimony or evidence that he had any day-to-day responsibility for the restaurant" or "that he personally benefited from the operation of the restaurant. There's no evidence of any commingling of funds." The trial court did not specifically discuss defendant Andrea Thong or the entity defendants in its tentative ruling.

The trial court found that NPBH sufficiently complied with corporate formalities for a small, closely-held business, including maintaining adequate minutes of meetings, recording stock transfers, making required filings with the Secretary of State, and maintaining a corporate bank account. The court found NPBH was adequately capitalized, based on it having sufficient funds initially for leasehold improvements and then operating for almost three years. The court stated that the restaurant operated "on a day-to-day cash basis," and therefore did not need as much capitalization as other businesses that might see delays in receiving income.

### 3.    Evidence identified by landlord on appeal

Rather than summarizing all relevant evidence presented at trial, we will summarize landlord's own description of the evidence purportedly establishing that defendants are NPBH's alter egos. We explain in our subsequent Analysis section where

we take particular issue with landlord's characterization of the evidence.[10]

### a. *Capitalization*

Landlord claims the evidence showed NPBH was undercapitalized. Landlord points to evidence indicating NPBH had low cash on hand and no initial capital infusion, and what sums were contributed to the company were primarily used to make leasehold improvements, and were therefore not available to pay for operational expenses. Much of the money coming to the corporation was characterized as loans from shareholders. NPBH reported a substantial net loss every year.

Landlord's expert witness calculated that NPBH had obligations exceeding $2.5 million, and presented a chart indicating that NPBH consistently operated at a negative cash balance and gradually depleted its equity until it shut down.

### b. *Common ownership and control*

Landlord contends NPBH was a "quintessential 'friends and family' small business." Landlord points to evidence that Phillip Thong and Ly Hua were "longtime friends." Henry Hua is Ly Hua's son and Andrea Thong is Phillip Thong's daughter. Shares were issued to other family members such as Mimi Hua and Linda Hua. Wendy Lam was an officer and shareholder in one of the entity defendants along with Ly Hua. Payments were

---

[10] To the extent we do not expressly take issue with any part of landlord's characterization of the evidence, this should not be taken as validation of that characterization, but merely that we accept that characterization arguendo for purposes of this appeal.

41

made to family members as "consultants," although landlord contends there was no evidence those individuals provided any consulting services.

Landlord contends the evidence showed the individual defendants "routinely hold themselves out as owners of" NPBH and the entity defendants. Henry Hua worked for one of the other entity defendants before he worked at NPBH.

### c. *Others holding themselves out as liable for debts of NPBH*

Landlord asserts Phillip Thong held himself out as liable for the debts of NPBH. This was evidenced by his provision of the personal guaranty, the fact that his family trust paid for NPBH's first and last month's rent and security deposit at the beginning of the lease, and Phillip Thong's statement to the designer renovating the premises that Thong's credit was good and he promised the designer would be paid.

Defendants' expert identified on a financial exhibit an "advance" from a "sister company" to NPBH.

### d. *Corporate formalities*

Landlord contends the minutes of NPBH's board meetings were a "sham" because they were prepared by Phillip Thong, who admitted he was not present, and were signed by Wendy Lam, whom Phillip Thong testified had limited ability in English. Some minutes stated Henry Hua was present, but Henry Hua testified he never attended those meetings.

Landlord argues the evidence showed company shares issued for no value and transferred to family members for no consideration, with no correlation to the shareholders' ownership interest or equity investment. NPBH's records did not explain

why some financial infusions were booked as loans and others as capital payments.

### e. *Diversion of assets for defendants' benefit*

Landlord contends the evidence showed defendants taking assets for their own benefit from NPBH. Landlord points to a general ledger from 2014 listing two payments to Dara Thong, whom landlord contends is Phillip Thong's wife. One payment is for $1,166, and one for $1,680.54. The ledger also shows multiple payments to Mimi Hua and Jasen Lam, identified by Phillip Thong as his brother-in-law, as consultants.

Landlord also points to evidence previously described that when NPBH closed, some inventory was transferred to one of the entity defendants, some property was stored in a San Gabriel warehouse, and NPBH wrote various assets off its books. Landlord contends evidence also shows NPBH repaid loans or made cash payments to the entity defendants, as well as vendors servicing the entity defendants, Phillip Thong's accounting firm, and NPBH's lawyer.

### f. *Shared attorney, accountant, bank, and address*

Landlord notes that all defendants are represented by the same counsel that represented NPBH, Phillip Thong's accounting firm provided services to all the entity defendants, and all entity defendants used the same bank, of which Phillip Thong was a director. When NPBH shut down, its bank account was transferred to the same address as two of the other entity defendants.

### g.    *Defendants' confusion of various entities*

Landlord claims Phillip Thong's testimony that defendants' expert was retained by NPBH, the nonappearing defendant, suggests Phillip Thong saw no distinction among the various defendants.

### 4.    Analysis

We note at the outset that the applicable law and standard of review outlined above make it exceedingly difficult for an appellant to obtain reversal of a trial court's finding that a party is not the alter ego of a corporate entity.  This is particularly so where, as here, there is no statement of decision, and therefore we must presume the trial court made all factual findings necessary to support its ruling.  Even assuming the evidence supports the presence of some of the alter ego factors, no factor is in and of itself determinative.  The trial court therefore could have found the absence of other alter ego factors weighed against piercing the corporate veil.  It is not surprising, therefore, that landlord cites no case, nor have we discovered one, in which a reviewing court has reversed a trial court's ruling that a party has failed to prove alter ego.

With this in mind, we conclude landlord has not shown as a matter of law " 'such a unity of interest and ownership between the corporation and its equitable owner that the separate personalities of the corporation and the shareholder do not in reality exist.' " (*Hasso, supra*, 227 Cal.App.4th at p. 155.)

Landlord's evidence did not establish as a matter of law several key alter ego factors.  NPBH had multiple shareholders and officers; this was not a circumstance in which one person or family unquestionably was in control.  (See *Zoran Corp.*, *supra*,

44

185 Cal.App.4th at p. 811 [one alter ego factor is " ' "sole ownership of all of the stock in a corporation by one individual or the members of a family" ' "].)  Although landlord tries to characterize the shareholders as a unified group based on friendship, familial relationship, or professional relationship, the record is lacking in evidence as to how the defendants interacted with one another and what role they played in NPBH's decisionmaking.  Certainly there was no evidence compelling the conclusion they were of one mind on key matters or that one person or family had particular control.  Absent evidence of a unity of interest among the various shareholders, we cannot conclude there was a unity of interest between the shareholders as a group and the corporation.

There is a similar lack of evidence in regard to the entity defendants.  Landlord identifies virtually no evidence establishing the ownership structure of those entities.  Landlord contends the individual defendants "routinely hold themselves out as owners of" the entity defendants, but cites no evidence supporting this contention.  At most, landlord cites a document showing that Wendy Lam and Ly Hua are directors and officers of one of the entities, but this is insufficient to establish " ' "identical equitable ownership" ' " with NPBH, much less the other entity defendants.  (*Zoran Corp.*, *supra*, 185 Cal.App.4th at p. 811.)  Although there is evidence the entity defendants conducted business with NPBH, the evidence does not compel the conclusion those transactions were not proper, arm's-length transactions.  Indeed, there was little evidence at all as to how the entities interacted with one another, and no evidence that any entity defendant controlled NPBH.  Nor does repayment of debts or the transfer of funds upon NPBH's closure in and of

45

itself prove " ' "the manipulation of assets and liabilities between entities so as to concentrate the assets in one and the liabilities in another." ' " (*Id.* at p. 812.)

These conclusions are reason enough to affirm the trial court on the issue of alter ego, even assuming arguendo landlord's evidence proved the presence of some alter ego factors. Landlord did not, however, prove its listed factors as a matter of law. At least some of the evidence landlord cites as evidence of abuse of the corporate privilege supports innocent inferences as well.

For example, the fact that NPBH paid consulting fees or other monies to shareholders or their family members does not prove those individuals did not provide goods or services to NPBH in exchange. Phillip Thong's testimony that he prepared the corporate minutes, despite not being at the meetings, does not preclude the possibility that Wendy Lam took notes in whatever language she preferred, which Phillip Thong then translated and converted into official minutes.

We acknowledge that a key area of dispute at trial was whether NPBH was adequately capitalized, and landlord devotes considerable space in its briefing to this issue. As a matter of substantial evidence, we note defendants put forth an expert witness who testified NPBH was indeed adequately capitalized, testimony we must assume the trial court credited given the standard of review.[11] Even if the expert's opinion was invalid,

---

[11] Landlord notes the trial court stated it did not find either party's expert's testimony "very helpful." This does not indicate the trial court disbelieved all aspects of that testimony. Regardless, we cannot rely on the trial court's oral comments to impeach the judgment. (*Shaw, supra*, 170 Cal.App.4th at p. 268.)

however, "[e]vidence of inadequate capitalization is, at best, merely a factor to be considered by the trial court in deciding whether or not to pierce the corporate veil." (*Associated Vendors, Inc. v. Oakland Meat Co., Inc.* (1962) 210 Cal.App.2d 825, 841– 842.) Given the other factors the trial court could have found in favor of defendants, NPBH's undercapitalization would not justify reversing the trial court, even were we to accept landlord's analysis of that factor.

## F.     Landlord Fails to Show Prejudice From its Claims of Evidentiary Error

Landlord claims the trial court made a number of evidentiary errors. We review such claims for abuse of discretion. (*Twenty-Nine Palms Enterprises Corp. v. Bardos* (2012) 210 Cal.App.4th 1435, 1447.) "[A]n erroneous evidentiary ruling requires reversal only if 'there is a reasonable probability that a result more favorable to the appealing party would have been reached in the absence of the error. [Citation.]' [Citations.]" (*Id.* at p. 1449.) Under these principles, we conclude none of landlord's challenges merits reversal of the judgment.

Landlord notes that at the outset of trial, the trial court referred to the large number of exhibits and said, "Somebody is going to have to boil this case down to the six or eight or ten or 12 exhibits that are important for me." Further, throughout the trial, the trial court instructed the parties to "move along"— landlord contends this was directed to landlord's counsel far more often than to defendants' counsel. Landlord does not explain how or why these comments amount to reversible error, and we do not address them further.

Landlord contends the trial court erred by granting defendants' motion in limine to restrict the expert testimony to

the issue of NPBH's capitalization, and not to allow the experts to opine on the lack of corporate formalities or the injustice prong. Landlord does not explain what specific evidence landlord would have introduced but for this ruling and how it might have affected the outcome of the trial, and therefore fails to show prejudice. We note that landlord's expert did in fact testify regarding corporate formalities, despite the trial court's ruling and without objection from defendants.

Landlord argues the trial court improperly relied on hearsay evidence when assessing the issue of capitalization, namely a news article submitted with defendant's expert report. The trial court also sustained objections to landlord's questions to Phillip Thong regarding what Thong believed was a sufficient amount of capital to run the restaurant.

Although the trial court read aloud a portion of the news article to which landlord refers when making its initial comments after the close of evidence, in the absence of a statement of decision we cannot assume the trial court relied on that article in rendering judgment. (*Shaw*, *supra*, 170 Cal.App.4th at p. 268 ["a court's oral comments . . . may never be used to impeach the order or judgment on appeal"].) Landlord does not explain what testimony Phillip Thong would have provided had the trial court not sustained the objections to landlord's questions, and therefore fails to demonstrate prejudice.

Finally, landlord provides a long list of testimony and evidence the trial court excluded, with a parenthetical for each explaining the topic to which the testimony or evidence pertained. Again, landlord does not explain how, had this evidence been admitted, there is a reasonable probability of a more favorable result for landlord.

## G.     The Issue of Damages Is Not Properly Before Us

Landlord contends the trial court applied the wrong measure of damages on the default judgment against NPBH. As discussed, the trial court has not yet signed the proposed judgment prepared by landlord, and therefore there is no damages award from which to appeal. This argument is not properly before us and we decline to address it.

We also decline landlord's invitation to provide guidance to the trial court as to how to assess damages against Henry Hua on remand. The trial court has yet to address the damages attributable to Henry Hua, and should have the opportunity to do so in the first instance.

## H.     The Award of Fees and Costs Must Be Reversed

The parties have not briefed how we should address the fees and costs award in the event of a partial reversal. We think it best that the trial court should address that issue in the first instance. We therefore vacate the awards of attorney fees and costs. The parties may seek fees and costs anew in the trial court. We express no opinion as to how the trial court should rule on those requests.

## DISPOSITION

The judgment is reversed as to Heng Henry Hua only. The trial court is directed to enter judgment against Heng Henry Hua on Unified Real Estate Investments, LLC's cause of action for conversion. The trial court is further directed to determine damages consistent with this opinion. The trial court's award of attorney fees and costs is vacated. The judgment otherwise is affirmed. The parties shall bear their own costs on appeal.

NOT TO BE PUBLISHED.

BENDIX, J.

We concur:

ROTHSCHILD, P. J.

CRANDALL, J.*

---

\* Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.